OPINION OF THE COURT
Meyer, J.
Where defendants charged with murder, kidnapping and conspiracy have stated as part of their planning that they have a place for disposing of the body “where we put people * * * and they haven’t found them for weeks and months”, the statement is admissible because its probative value as to premeditation of the murder and as to the plan of the conspiracy outweighs the prejudice resulting from *356 the admission implicit in the statement that defendants have committed prior murders. In view of the potential for prejudice in such testimony, however, a prosecutor who intends to adduce it before the jury should first obtain a ruling from the Trial Judge by offering the testimony out of the presence of the jury, and the Trial Judge should exclude any part of it that is not directly probative of the crimes charged. While that was not done in. the instant case the portion of the statement that may have been excluded had it been done is essentially cumulative of the part which was admissible. That being so, and the other contentions urged by defendants not constituting grounds for reversal, either because not preserved, not error or not an abuse of discretion,[1] the order of the Appellate Division affirming their convictions should be affirmed.
Defendants were indicted together with Victoria Ardito and charged with the murder of her lover, Benjamin Mattana. The theory of the prosecution was that Ardito had hired defendants to kill Mattana because he was about to leave her for another woman. During trial Ardito became incompetent to stand trial, and the case against her was severed.
The prime witness for the prosecution was John Dellacona, who claimed that he had been impressed into service by defendants who made him their driver. He gave a complete account of the events leading up to the murder of Benjamin Mattana, which took place in the early morning hours of April 28,1976. According to Dellacona, Ardito had agreed to lend him money and had instructed him to meet her at 7:30 p.M. on April 27, 1976 at Exit 19 of the Southern State Parkway. At the meeting place Dellacona found not only Ardito but also defendants Ventimiglia and Russo. *357 Together they drove to the parking lot of a nearby bowling alley, where defendants made clear to Dellacona that he was to participate in a murder and that his participation was not a voluntary matter.
Benjamin Mattana operated a motorcycle shop, in Lynbrook. Dellacona testified that Ventimiglia first made a short trip from the bowling alley to the motorcycle shop in order to decide whether the murder could be accomplished there. Concluding that the shop was too busy, Ventimiglia returned to the bowling alley parking lot and together Dellacona, Ventimiglia, Russo and Ardito departed for Mattana’s residence in Lloyd Harbor.
At trial Dellacona gave detailed testimony about discussions between the defendants as to who was to kill Mattana and where and how it was to be done. Because Ardito did not want Mattana killed in the house, they devised a plan whereby Mattana would be taken to a desolate area where the murder would go unnoticed. The plan was for defendants to hide in Mattana’s house until he came home and retired for the evening with Ardito, then burst into the bedroom and, pretending that their only purpose was to rob the safe in Mattana’s motorcycle shop, to demand the keys to the shop and the combination of the safe. Russo was then to “force” Ardito to accompany him to the shop, while Ventimiglia remained at the house with Mattana. After opening the safe and removing its contents, Russo was to call Ventimiglia at Mattana’s house and inform him that the safe would not open, after which Ventimiglia would instruct them to return to the house so that Ventimiglia and Russo could take Mattana back to the motorcycle shop and force him to open the safe. The latter statement would, of course, be mere pretext; Mattana was to be taken from his house to be murdered.
Dellacona’s recitation of the discussion between and with defendants concerning where the murder was to take place is the subject of this appeal. As ultimately detailed before the jury it was as follows: “Benny said that they would take him [Mattana] to ‘their spot’. Mario said, ‘Yeah, it’s a good idea, we’ll take him over there.’ I had said, ‘You mean you done it before?’ and Benny said, ‘Yeah, we did *358 it before.’ Mario said, ‘Yeah, just a couple of times’ and like snickered. Ben then said to me, ‘Junior, we have a spot over by — you know where the Belt Parkway is?’ I said, ‘Yeah’. He said, ‘Right over there by the dumps, we have a spot where we put people there and they haven’t found them for weeks and months.’ ”[2]
Defendants objected that “testimony of another alleged murder committed by Mr. Russo and Mr. Ventimiglia” was inadmissible and moved for a mistrial. Conceding that the statements were declarations by defendants implying a prior crime, the District Attorney argued that they were nevertheless admissible because they showed that the reason the defendants had chosen to commit the murder in the particular spot they did, some 30 miles from Mattana’s home, was the possibility that his body would decompose before it could be discovered, that the statements related to the “where, why and how the murder was committed in the very remote section * * * where * * * it was carried out.” The Trial Judge overruled the objection not only when first made, but also when repeated as part of a motion for a mistrial at the end of the People’s case and when at the jury’s request the testimony was reread to them during deliberation.
The remainder of the testimony need not be detailed, except to note, that Dallacona’s account of what actually happened thereafter showed that while the events did not occur exactly as planned, the essentials of the plan were carried out. Dellacona drove the group to Howard Beach, where Mattana was ordered out of the car and led into the tall weeds of the marshes bordering Jamaica Bay. Dellacona heard several “pops” coming from the direction of the weeds, and when Ventimiglia returned he related that Mattana had tried to escape and it had taken several bullets to kill him. Evidence from other witnesses corroborative of Dellacona’s testimony was also presented. The jury found defendants guilty of second degree murder, first degree kidnapping and first degree conspiracy and the Appellate Division affirmed.
*359 The rule excluding evidence of uncharged crimes is based upon the human tendency more readily “to believe in the guilt of an accused person when it is known or suspected that he has previously committed a similar crime” (People v Molineux, 168 NY 264, 313; People v Allweiss, 48 NY2d 40, 47; see People v Zackowitz, 254 NY 192, 198) and is intended to eliminate the danger that a jury may convict to punish the person portrayed by the evidence before them even though not convinced beyond a reasonable doubt of his guilt of the crime of which he is charged.
The rule is not an absolute, however. Its policy of protection against potential prejudice gives way when evidence of prior crime is probative of the crime now charged (People v Allweiss, supra; People v Vails, 43 NY2d 364; People v Jackson, 39 NY2d 64). There is no litmus paper test for determining when the probative value of the evidence outweighs its potential for prejudice. Attempts to categorize situations in which evidence of prior crime is admissible have yielded Molineux’ well-known listing (168 NY, at p 293) of “(1) motive; (2) intent; (3) the absence of mistake or accident; (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the others; (5) the identity of the person charged with the commission of the crime on trial”, but even that listing is acknowledged to be “merely illustrative” (People v Vails, supra, at p 368) and “not exhaustive” (People v Santarelli, 49 NY2d 241, 248) or capable of statement with “categorical precision” (People v Molineux, supra, at p 293).
Efforts to quantify the degree of probativeness necessary for admission establish that the evidence must be of more than “slight value” (People v Allweiss, supra, at p 47), but the authorities are not in agreement concerning whether it must be “highly probative” (id., at pp 47 and 49), simply “directly probative” (People v Vails, supra, at p 368; People v Jackson, supra, at p 68), or “substantially relevant” (McCormick, Evidence [2d ed], § 190, p 447), phrases which are themselves not entirely distinguishable. In final analysis the process is one of balancing in which both the degree of probativeness and the potential for *360 prejudice of the proffered evidence must be weighed against each other (People v Santarelli, supra; People v Allweiss, supra). Factors which play a part in measuring probative value are “the degree to which the evidence persuades the trier of fact that the particular fact exists and the [logical] distance of the particular fact from the ultimate issues of the case” (Dolan, Rule 403: The Prejudice Rule in Evidence, 49 So Cal L Rev 220, 233). Further, as the Supreme Court of California noted in People v Stanley (67 Cal 2d 812, 818-819): “On the issue of probative value, materiality and necessity are important. The court should not permit the admission of other crimes until it has ascertained that the evidence tends logically and by reasonable inference to prove the issue upon which it is offered, that it is offered on an issue material to the prosecution’s case, and is not merely cumulative.” Important in the weighing process will also be how the evidence comes into the case, that is, whether at the instance of the People initially, or in rebuttal to a defense offered by defendant (People v Tas, 51 NY2d 915; People v Santarelli, supra; see People v Allweiss, supra).
Against that background, the first two and last two sentences of the testimony here in issue were unquestionably admissible. The crimes with which defendants were charged included intentional murder and conspiracy. The first two sentences constitute direct evidence of agreement between Russo and Ventimiglia, but not of an agreement to kill. The last two sentences made clear that defendants had agreed to take Mattana to their “spot” at Howard Beach for one reason only: to kill him. Together the four sentences bore directly on issues material to the prosecution’s case: that there was an agreement between Russo arid Ventimiglia and that the agreement was to kill and to do so in a way that might avoid discovery. Recounting as they did defendants’ admissions as to what they planned and why, the four sentences compellingly demonstrate both premeditation and conspiracy to murder. Moreover, the prosecutor’s reference to the “where, why and how the murder was committed in the very remote section” where it was, while not including the words “premeditation” and *361 “agreement”, sufficiently presented the purposes for which the testimony was offered as the purposes for which we now hold the Trial Judge correctly admitted it, to withstand defendants’ argument (predicated on the holding of People v Zackowitz, 254 NY 192, 199-200, supra) that to sustain admission of the evidence is to treat them unfairly. Because the sentences referred to were directly related to ultimate issues in the case and as admissions by defendants were strongly persuasive and, therefore, not merely cumulative, we conclude that the Trial Judge did not err in admitting them.
Considered separately the third and fourth sentences of the testimoriy quoted above refer only to prior killings by defendants and should have been excluded because not relevant to or in any way probative of the charges being tried. The Trial Judge may have regarded them as “inextricably interwoven” in the conversation Dellacona was reciting within the meaning of People v Vails (43 NY2d 364, 368, supra), but the Vails holding does not make evidence admissible simply because it is a part of conversation other parts of which are admissible. To be inextricably interwoven in the Vails sense the evidence must be explanatory of the acts done or words used in the otherwise admissible part of the evidence. Here the third and fourth sentences were unnecessary to an understanding of the other parts of the testimony and should therefore, have been excluded. The error is not reversible, however, because the necessary implication of the fifth and sixth sentences put before the jury the fact that defendants had murdered more than once before (“we put people there and they haven’t found them for weeks and months” [emphasis supplied]).
While that disposes of the issues on this appeal, we deem it proper to add some thoughts concerning the procedure to be followed in cases involving potentially prejudicial testimony such as that considered above. In People v Santarelli (49 NY2d 241, 249, supra), we noted the particularity with which a Trial Judge should evaluate (indeed, parse would be a better word) such evidence. When a prosecutor, knowing that such evidence is to be presented, waits until objection is made when it is offered during trial be *362 fore informing the court of the basis upon which he considers it to be admissible, there is unfairness to the defendant, even if his objection is sustained, in view of the questionable effectivness of cautionary instructions in removing prior crime evidence from consideration by the jurors. There is, moreover, a greater probability of error, and consequent waste of scarce judicial resources, when evidentiary rulings are made during trial than in the more relaxed atmosphere of an inquiry out of the presence of the jury. Whether some time prior to trial, just before the trial begins or just before the witness testifies will depend upon the circumstances of the particular case, but at one of those times the prosecutor should ask for a ruling out of the presence of the jury at which the evidence to be produced can be detailed to the court, either as an offer of proof by counsel or, preferably, by presenting the live testimony of the witness (Dolan, op. cit., supra, 49 So Cal L Rev, at p 255; Rothblatt and Leroy, The Motion in Limine in Criminal Trials: A Technique for the Pretrial Exclusion of Prejudicial Evidence, 60 Ky LJ 611; Ann., 63 ALR3d 311). The court should then assess how the evidence came into the case and the relevance and probativeness of, and necessity for it against its prejudicial effect, and either admit or exclude it in total, or admit it without the prejudicial parts when that can be done without distortion of its meaning (Dolan, op. cit., supra, at pp 254-255).
For the foregoing reasons, the order of the Appellate Division should be affirmed.
Chief Judge Cooke and Judges Jasen, Gabrielli, Jones, Wachtler and Fuchsberg concur.
In each case: Order affirmed.

. Denial of a mistrial after severing the trial as to defendant Ardito was not error in view of the fact that much of the testimony as to her did not relate to defendants and of the Trial Judge’s careful instructions to the jury as to what testimony should be excluded. Admission of the photographs, shirt and telephone chart were well within discretionary bounds. The reference in the prosecutor’s summation to defendants’ privilege not to testify was rendered harmless, both defendants having specifically requested the Trial Judge to charge that the jury could draw no inference from their not testifying (CPL 300.10, subd 2). Other claimed errors concerning the prosecutor’s summation and the court’s charge either were not preserved or are groundless.

. Defendant Ventimiglia is also known as Benjamin Ventimiglia and was referred to throughout Dellacona’s testimony as Benny or Ben. The “spot” referred to was shown by later testimony to be located at Howard Beach.