(August 14, 1986)

■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v CHARLES ALVINO, Appellant.—Judgment of the Supreme Court, New York County (Martin Stecher, J., at trial with a jury), rendered June 28, 1983, which convicted defendant of bribe receiving in the second degree and issuing a false certificate, is affirmed.

In the course of defendant's trial in late April and early May 1983, the jury learned that he was employed at the Department of Motor Vehicles (DMV) as a cashier since September 10, 1982. DMV cashiers have the duty of processing and generating licenses on a computer terminal located at their station and to receive statutory fees only in payment therefor. There is a two-step procedure to obtain an amended license such as the one which became the subject of this prosecution. The applicant fills in a white portion of an application form indicating the changes to be made. This form, together with the original license, is presented to an examiner who will normally approve the amendments after submission of any necessary proof. The examiner then writes

in red on the blue part of the application form noting or circling the amendments to be made and then signing it. The applicant then proceeds to a cashier who punches into the computer the information recorded in red by the examiner. The computer then generates the license and the cashier collects the appropriate fee.

An allegedly false application form was introduced into evidence as part of the People's proof that defendant accepted a $100 bribe to issue a fraudulent amended license in the name of "Victor Lopez". Attached to the back of this application was a duplicate license in the same name; the duplicate had a number 4 on it to indicate that this was the fourth duplicate license issued for that driver. This amendment listed three requested changes: There was a height change from 5 feet, 7 inches to 5 feet, 9 inches, a 10-year "correction" in the date of birth and a change of eye color. The examiner's approval was limited to height and date of birth. Because of the incomplete treatment of the eye color change and an alteration in the date change, an investigator witness for the DMV testified that this *might have alerted a cashier* to refer the application back to an examiner or at least to consult his supervisor. The same witness conceded that there were long lines at the DMV every day and that a cashier was pressed to complete many transactions throughout the day.

The jury also heard testimony from an admitted DMV briber, Mario Falto, who was acting undercover as an informant during the pertinent time period. He testified that for a period of about 10 years his sole employment was the illegal procurement of fraudulent documents from DMV for various types of "customers" ranging from those who preferred to obtain learner's permits without taking the preliminary test (here a $5 or $10 bribe would suffice) to fraudulent licenses and registrations (presumably for people who felt they could use a false identification). Falto described his method of operation as follows: First he would fill out an application for a duplicate license in whatever name the customer desired and then bribe an examiner to find out whether there was an already existing license on record with that name. If the name search was successful, the examiner would give Falto the motor vehicle identification number for that license and then Falto was able to obtain a duplicate license in that name. The next step required Falto to fill out an application for an amended license, requesting changes to correspond with his customer's actual attributes such as a new height, date of birth, color of eyes, etc., and then bribe either the same or a

different examiner to approve that application. He would then bribe a corrupt cashier to issue the fraudulent license.

In July 1982, Falto's criminal activity was terminated by his arrest. To resolve his predicament, Falto agreed to cooperate and cut himself a deal with the District Attorney's office in writing which provided, in substance, that the full extent of his cooperation would be made known in any prosecution of him. At the time of defendant's trial, Falto had not yet been indicted for any crime. Falto denied any understanding by him that the more people he implicated, the better it would be for him, but he did admit that he knew he would have to incriminate somebody as proof of his cooperation.

The jury also learned of the events on September 10, 1982 which led to defendant's conviction. On that day, Falto testified, after bribing the examiner with $50 to obtain the required approval for the amendments, he went to defendant's cashier window and after receiving the amended "Lopez" license, he gave the defendant $100. This transaction was corroborated by an undercover police officer. The transaction was also corroborated by a tape recording put before the jury which is set out in full in the first footnote of the dissent. Defendant's only responsive comment was: "Have a nice day."

Also placed before the jury were the contents of a second tape-recorded conversation between Falto and defendant, quoted verbatim in the dissent, in which Alvino responds with the perfunctory acknowledgments ("yeah", and "okay" twice) to a request by Falto to Alvino not to tell "Miguel" that defendant did anything for Falto. The import of this conversation, apparently, was that Falto was poaching on the "connections" of his partner in crime, one Miguel Cruz, and did not wish Cruz to know about this. Yet no knowledge by defendant of the relationship of Falto and Cruz is established by defendant's laconic and equivocal answers. Also, the People introduced a third tape recording of a conversation between defendant and Falto, on August 2, 1982, in which Falto complains about the fact that Cruz has disappeared with $200 without taking care of some corrupt transaction and that Alvino has not seen Cruz either. Alvino indicates he can't be helpful; Falto says that auditors are present making his work difficult; Alvino indicates that these auditors may be gone "this week or next week or whenever"; and defendant concludes the conversation by stating: "I'm gonna go out." While these tapes demonstrate that Falto was a cooperative (if not terribly skillful) undercover operative, they are quite ambiguous with respect to any criminal involvement by defendant.

Before the People rested their case, the jury learned a good deal about Falto which, wholly apart from his role as an informer out to save his own skin by turning in others, would severely impair his credibility as a reliable witness. Falto told the jury that, prior to 1981, he had owned a driving school, but, upon separating from his family, he transferred the school to his brother to frustrate any effort by his wife to collect either maintenance or child support. He began obtaining illegal permits from the DMV while working for the owner of another driving school with Miguel Cruz, a fellow employee, as his senior partner in crime. Falto felt obliged to conceal this activity because his employer also worked with Cruz in obtaining illegal DMV documents. The employer fired Falto when he found out that the latter was invading his illegal turf.

Thereupon, Falto and Cruz continued their illicit business as partners but, as might be expected, as soon as Falto learned of Cruz' "connections" at the DMV, he began to cut Cruz out. Presumably the "partnership" came to an abrupt and final demise when Cruz was subsequently arrested after Falto turned him in.

The dissent argues that on their direct case the People should have been limited to the foregoing evidence, and that it was error to permit the prosecution, as part of that direct case, to introduce, through Falto, evidence of 15 similar bribery transactions between Falto and defendant. While there can be no disagreement with the general principles of law so ably elucidated by our dissenting colleague, we find that this evidence of uncharged crimes was clearly admissible as proof of defendant's corrupt *intent*, which is the second of the five familiar categorical exceptions barring proof of uncharged crimes found in *People v Molineux* (168 NY 264, 293), the seminal case in this area. It must be emphasized that the two crimes for which defendant was indicted make a corrupt intent the very essence of the offense. Bribe receiving in the second degree (Penal Law § 200.10) is defined as follows: "A public servant is guilty of bribe receiving in the second degree when he solicits, *accepts* or agrees to accept *any benefit* from another person *upon an agreement or understanding that* his vote, opinion, judgment, *action,* decision or exercise of discretion as a public servant *will thereby be* influenced." (Emphasis added.)

Thus, the People, as part of their case-in-chief, were required to prove not only that Falto placed $100 in front of defendant, following which defendant issued a document, but

they had to go considerably further and prove beyond a reasonable doubt that the acceptance of the $100 by defendant was "upon an agreement or understanding that his * * * action * * * as a public servant will thereby be influenced." The uncharged crimes established this vital element, as well as to *negate mistake or accident,* the third *Molineux* exception.

If the People's proof was limited in the manner urged by the dissent, the jury might easily find that defendant's acceptance of the application was entirely innocent or mistaken, that there was nothing in it that he consciously knew to be false, and that the $100 came as a complete surprise to him. At the very least, on such a suppositious state of the record, defendant would be free to argue that this was simply an unlawful gratuity, a misdemeanor rather than a felony *(cf.* Penal Law § 200.30).

Similarly, the second crime for which defendant was indicted, issuing a false certificate (Penal Law § 175.40), also places intent at the heart of the crime. This statute reads as follows: "A person is guilty of issuing a false certificate when, being a public servant authorized by law to make or issue official certificates or other official written instruments, and *with intent to defraud, deceive or injure another person,* he issues such an instrument, or makes the same with intent that it be issued, *knowing that it contains a false statement or false information."* (Emphasis added.)

Here also, the need to prove both intent, and to remove the possibility that defendant did not act through negligent mistake, but rather clear knowledge that the information in the application must have been false, made evidence of the uncharged crimes admissible and absolutely necessary if the prosecution were fairly to meet its burden *(People v Marrin,* 205 NY 275; *People v Ventimiglia,* 52 NY2d 350; *Matter of Brandon,* 55 NY2d 206).

The Trial Judge was meticulous in assuring a fair trial to defendant, first by holding an *in limine* hearing on the prior crime proof outside the presence of the jury in conformity with *People v Ventimiglia (supra),* and then instructing the jury both in the course of the trial, and in its final charge, *regarding the limited purpose for which the evidence was to be received.* Thus, the jury was resolutely steered away from the "bad man" appraisal of defendant which is the central concern of the dissent. In short, under well-recognized principles, and despite the considerable proof of prior transgressions, defendant received a fair trial. Concur—Ross, Asch, Rosenberger and Wallach, JJ.

Murphy, P. J., dissents in the following memorandum: Defendant Charles Alvino has been convicted of bribe receiving in the second degree (Penal Law § 200.10) and issuing a false certificate (Penal Law § 175.40). At his trial, two witnesses, an informer who participated in the illicit transaction and an undercover police officer, testified that they saw defendant, a Department of Motor Vehicles cashier, issue an amended license with false information and immediately thereafter accept $100.* Ordinarily there is no charge for issuing an amended license. A tape recording made a few hours after the alleged crime of a conversation between defendant and the informer tended to confirm that defendant had indeed accepted money for issuing the amended license.

In addition to this evidence of the crimes charged, the prosecution, in its case-in-chief, was permitted to introduce testimony by the informer and the undercover officer of at least 15 uncharged acts apparently similar if not nearly identical to the conduct underlying the offenses charged. Before trial, a hearing was held concerning the admissibility of this evidence. The court characterized the overt conduct constituting the charged crime as "highly ambiguous" in its signification of criminality. The court thus ruled, relying heavily upon *Matter of Brandon* (55 NY2d 206), that the evidence purporting to be of uncharged offenses would be admissible for the purpose of proving that defendant had the requisite guilty knowledge and intent to commit the crimes of which he was accused. The jury was instructed that this evidence was to be considered only with regard to defendant's state of mind and as it bore upon his credibility.

It is basic that a defendant's guilt of the offense charged may not be proven by evidence of other crimes showing a predisposition to criminal conduct *(People v Molineux,* 168 NY 264, 313; *People v Allweiss,* 48 NY2d 40, 47; *People v Ventimiglia,* 52 NY2d 350, 359; Richardson, Evidence §§ 170, 184 [Prince 10th ed]). The nature of the inference to be avoided is: defendant has done bad things; therefore he is a bad man and is characterologically prone to have done other bad things

---

* A tape recording of the transaction admitted in evidence contained the following exchange:

"FALTO: Charlie, can I get this one done here?

[pause]

"FALTO: Here's a hundred, Charlie; thank you very much.

Bye.

"ALVINO: Have a nice day."

including the offense with which he is charged (1A Wigmore, Evidence § 55.1, at 1160 [Tilliers rev ed]). It is not that a man's character is irrelevant to his conduct. Rather, evidence of character may seem to prove too much; its admission raises the possibility that a defendant will be convicted not because he is proven beyond a reasonable doubt to have committed the crime charged, but because his history generally shows him to be a bad sort deserving of moral condemnation and punishment. *(Ibid.; see also, e.g., People v Allweiss, supra,* at p 48.) It is then to protect the defendant against a conviction rooted in broad prejudice, as opposed to proof of the particular illegality involved, that the rule exists.

Notwithstanding the rule's importance, it admits of exceptions. These are allowed where on balance the probative value of the evidence of prior misconduct outweighs the potential for prejudice *(see, e.g., People v Ventimiglia, supra,* at p 359). As noted above, the rule is not in the main to assure relevancy, but to prevent prejudice. The operation of the rule assumes some degree of relevancy, otherwise the evidence would be excluded on relevancy grounds alone. It follows that, to be admitted, evidence of a defendant's prior bad activity must be more than simply relevant or probative, it must be relevant in some specific way and it must be necessary. *(Supra,* at p 360.)

As to the necessity requirement, it should be observed that evidence of the sort at issue is recognized to pose a special risk of prejudice. Where its admission is not necessary to the People's proof, it should, therefore, be excluded since its probative value is by hypothesis slight when compared with the possibility for prejudice.

One recognized exception to the rule permits the introduction of evidence respecting similar uncharged crimes to establish criminal intent where intent is not clearly inferable from a defendant's behavior. Thus, in proving crimes such as the passing of counterfeit money or fraud, involving overt actions that themselves are not sufficiently indicative of criminality to sustain a conviction, the prosecution is permitted to show that the defendant has in the past committed similar acts accompanied by the same intent, the existence of which must be demonstrated as to the crime at issue *(see, People v Molineux, supra,* at p 297; *Matter of Brandon, supra).*

This exception, it seems to me, is of highly questionable propriety and must be limited to cases where the evidence sought to be introduced is clearly relevant and necessary to the prosecution's case. It must be remembered that the only

reason for the intent exception to the subject rule is that it is a necessary aid to the prosecution in proving the commission of certain crimes where intent may not be easily inferred *(see, People v Molineux, supra,* at p 299). The exception cannot be supported otherwise.

As Professor Wigmore points out, the argument in favor of the intent exception is that the successive repetition of illegal acts similar to the one charged makes it less likely that the act charged was innocently committed. (2 Wigmore, Evidence § 302, at 241 [Chadbourn rev ed]; *Matter of Brandon, supra,* at pp 211-212.) This resort to probability theory is no doubt meant to deflect criticism of the intent exception for its use of character evidence in precisely the manner forbidden by the rule, i.e., to prove guilt through characterologic propensity. Yet, it is only as character evidence that evidence of past crimes can have any conceivable relevance to the proof of intent. Professor Wigmore's exposition of the argument in favor of the intent exception does not prevent him from making the following critical observation:

"It must be noted that where the doing of an act is the proposition to be proved, there can never be a direct inference from an act of former conduct to the act charged; there must always be a double step of inference of some sort, a tertium quid. *In other words, it cannot be argued, 'Because A did an act X last year, therefore he probably did the act X as now charged.' Human action being infinitely varied, there is not adequate probative connection between the two. A may do the act once and may never do it again: and not only may he not do it again, but it is in no degree probable that he will do it again. The conceivable contingencies that may intervene are too numerous.*

"Thus, whenever resort is had to a person's past conduct or acts as the basis of inference to a subsequent act, it must always be done intermediately through another inference. It may be argued, 'A once committed a robbery; (1) therefore he probably has a thieving disposition; (2) therefore he probably committed this robery *[sic]';* or". (1A Wigmore, Evidence § 55.1, at 1160 [Tilliers rev ed] [emphasis added].)

Probability theory alone simply cannot be employed to support the intent exception. Evidence of prior bad acts is in no way directly probative of any part of the crime charged, least of all the *mens rea.* Such evidence would require exclusion on relevancy grounds alone if no other rationale existed for its introduction. The conclusion is unavoidable that insofar as the evidence has any probative worth it is as character

evidence demonstrating a propensity to criminal conduct and any intent entailed thereby. That such evidence can be highly prejudicial is, as observed above, the fundamental premise underlying the rule barring evidence of uncharged crimes. It would seem plain then that unless the prosecution's need is well demonstrated and the evidence is indeed probative on the issue of intent, the evidence should be excluded.

The District Attorney maintains that the direct evidence of the crimes with which defendant is charged is "highly equivocal" as to the existence of the requisite criminal intent and asserts that it was, therefore, necessary to introduce multiple instances of similar past conduct to strengthen the prosecution's case. The past conduct at issue is indeed apparently similar, if not virtually identical, to that forming the basis for the present prosecution. This, paradoxically, is the problem. For the past conduct is no more revelatory of criminal intent than the "highly equivocal" acts underlying the present charges. The compounding of equivocal acts is hardly probative of the existence of criminal intent on any one occasion. *Brandon (supra)*, upon which the trial court relied, presented a very different situation. There, the question was whether fraudulent intent could be demonstrated by admission of evidence of prior similar frauds. The crucial distinction is that in *Brandon (supra*, p 214), the intent element as to the prior conduct was firmly established by the existence of two former judgments against the appellant, Mrs. Murphy: "For purposes of the intent exception, there was a sufficient degree of similarity between the Sullivan-Metz matters—*as to each of which Mrs. Murphy is bound by the conclusion that she intended to defraud these individuals*—and the activities of Mrs. Murphy in this case to permit the introduction of evidence of the two prior judgments in order to negate her innocent state of mind."

Here, by contrast, the past conduct is no more demonstrative of defendant's state of mind than the present conduct and cannot, assuming that the present conduct is really equivocal as claimed by the District Attorney, be called upon to support any inference of criminal intent, much less one pertaining to acts wholly distinct in time and place.

The fact of the matter is, however, that, if believed, the People's direct evidence of the crimes charged was more than adequate to sustain a conviction. The testimony of the People's witnesses, if credited by the jury, would have established that defendant accepted $100 immediately after issuing an amended driver's license containing obviously false informa-

tion. As the transaction was one for which there was no official fee, the inference is not so obscure that defendant accepted a bribe for issuing the false document. This inference is strengthened by the conversation taped later on the day of the incident between the informant (Falto) and defendant:

"FALTO: Charlie, listen * * *

"ALVINO: Yeah.

"FALTO: Don't ever tell Miguel you did anything for me or that I * * *

"ALVINO: Okay.

"FALTO: * * * gave you the money, right?

"ALVINO: Okay.

"FALTO: Thank you."

Clearly, with this direct evidence, there was no need to introduce evidence tending to show defendant's commission of more than 15 similar prior crimes. The prejudicial effect of such evidence cannot be overestimated. Aside from creating the nearly inevitable impression that defendant was a persistent wrongdoer prone to commit the crimes charged, the evidence portrayed defendant as thoroughly dishonest and so placed his credibility in issue before he did so himself by taking the witness stand to testify in his own behalf.

The crucial issue in this case was not whether defendant intended to receive a bribe or issue a false certificate, but whether he did in fact receive $100 in the above-described circumstances. Once that fact had been established, the inference of criminal intent and guilt would have followed with near inevitability. Defendant denied receiving the money and claimed that he had been framed by the informant (Falto) who, having been arrested sometime before defendant, was out to obtain favorable treatment for himself. Thus, the case turned on the credibility of the various witnesses' conflicting accounts of the allegedly illegal transaction. Of course, it was the People's burden to prove defendant's guilt beyond a reasonable doubt on their direct case. Clearly, this is not permissibly accomplished by characterizing the defendant as bad or dishonest, but by credible competent proof of the crime charged. There were obvious reasons why the jury might have disbelieved Falto's testimony, yet with the premature introduction of evidence portraying defendant as thoroughly dishonest the jury was invited to a completely artificial and misleading comparison of the two men's respective capacities for truth telling. The jury was, in effect, invited to believe that defendant took the $100 bribe not because Falto's testimony

was credible but because defendant's anticipated claim to the contrary was incredible. The burden may not, in my opinion, be so easily shifted to the defendant. It is precisely for this reason that it is so important how the evidence of other crimes comes into the case *(see, People v Ventimiglia, supra,* at p 360).

The People argue that although they might have made a sufficient case against defendant without the introduction of evidence concerning uncharged offenses, they were nevertheless entitled to make their case "conclusive" with the help of the disputed evidence. *(See, People v Marrin,* 205 NY 275, 280.) Yet, it seems to me clear as a matter of logic that despite the pronouncements of the sharply divided *Marrin* court upon which the People rely, no crime admits of conclusive proof by evidence of other crimes merely similar to the one charged and otherwise unconnected therewith *(see,* 1A Wigmore, *op. cit.,* at 1160). The only basis for the prosecution's entitlement to prove a crime conclusively lies in its production of evidence fairly and competently demonstrating the defendant's guilt. The extensive evidence of uncharged crimes admitted in this case proved little if anything concerning the crime charged and was certainly unnecessary in light of the otherwise strong prima facie case against defendant. Perhaps the prosecution was concerned that the possibly poor credibility of its witnesses might render its case less than "conclusive", but evidence of uncharged crimes is plainly inadmissible on the People's direct case to remedy such a defect. Indeed, the only conclusive effect of the disputed evidence was to dangerously and unnecessarily heighten the possibility of defendant's conviction because of his propensity for dishonest behavior.

Accordingly, I dissent and would reverse and order a new trial.