[662 NYS2d 103]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v GERALD ARDITO, Appellant.

First Department, August 14, 1997

APPEARANCES OF COUNSEL

*Andrea G. Hirsch* for appellant.

*Donald J. Siewert* of counsel *(Robert M. Morgenthau, District Attorney* of New York County, attorney), for respondent.

### OPINION OF THE COURT

NARDELLI, J.

Defendant herein sought to take the stand and testify that the killing of his ex-girlfriend accidently took place during "rough sex." The court precluded the People from introducing direct evidence of a prior choking assault by him upon the victim just two months before the homicide. However, the defendant sought and was refused assurances from the court as to the scope of rebuttal by the People, as to the prior incident, if he took the stand and affirmatively placed their relationship in issue. This refusal was proper and did not deny defendant a fair trial.

To understand the issue before us, a short summary of the trial testimony is necessary. The defendant Gerald (Jed) Ardito met the victim Marie Daniele in 1988 when he hired her as a sales representative for the "temp" services agency that he owned, Temp Right Services. They had become romantically involved by October 1989 and became engaged in 1990. However, the relationship ended in October of 1990 when defendant became involved with another woman. Daniele left Temp Right and went to work for another agency, Viva Temp,

a month or two later, where she eventually attained executive rank. In January 1991, defendant married the other woman. However, the marriage only lasted three or four months and Daniele and defendant resumed dating. Thereafter, Daniele told defendant that she wanted to break up with him and she began seeing another man. She told friends that she nevertheless kept in contact with the defendant because she felt sorry for him.

On April 28, 1993, the defendant registered at the Grand Hyatt Hotel in Room 3431 and ordered lunch for two. That evening, a Senior Assistant District Attorney in the New York County District Attorney's office received a telephone call from a prominent member of the defense bar informing the prosecutor that he represented defendant, who was registered in Room 3431, and that the dead body of a woman, Marie Daniele, was in the room. The attorney said that defendant would surrender to the authorities. When the police arrived at the scene in the hotel, they found the body lying on the floor, partly undressed. There was no sign of a struggle. In the room, the police also found a jewelry box with gift wrapping under it, the victim's pocketbook and portfolio and the defendant's briefcase, which contained a photograph of him and Daniele with Daniele's face burned out.

Later that evening, the defendant called a friend and told him that Daniele's death had been an accident. The Medical Examiner determined that she had died by strangulation, "an absolute text book example of manual strangulation" in the words of the Chief Medical Examiner. According to him, the findings in this case were inconsistent with accidental death due to sexual asphyxia (compressing the neck assertedly to enhance sexual pleasure), since the compression of Daniele's neck had to continue for at least a minute or more after she went limp and lost consciousness. The Chief Medical Examiner testified that he knew of no claim that compressing the neck of a limp unconscious person "is a means of attaining sexual gratification."

Prior to the trial, the People sought to introduce evidence concerning an incident which had occurred on February 18, 1993, two months prior to Daniele's death, in which three witnesses had been awakened at about 2:50 A.M. by a woman screaming for help in a hallway at 336 West 49th Street in Manhattan. At least one witness saw defendant with his hands on Daniele's throat, and another chased defendant with a baseball bat. Yet another called 911 and Daniele's screams

could be heard on the tape of that call. The victim declined to press charges after this incident. The District Attorney noted that there were indications by the defense that defendant and Marie Daniele had engaged in "erotic asphyxia" before the murder and that defendant would defend on the theory that Daniele had died accidentally during "rough sex." Thus, the prosecutor argued that the uncharged February assault would be relevant and probative insofar as it would establish defendant's motive and intent in the homicide and refute defense claims of mistake, accident or rough sex.

At the conclusion of a *Ventimiglia* hearing (*People v Ventimiglia*, 52 NY2d 350), the court denied the People's motion to introduce evidence of the incident of February 18, 1993, finding the evidence "too ambiguous" to justify its admission on the People's direct case. It found that its probative value was "slight" compared with "the extremely prejudicial effect" it would have. After the court issued this ruling, it issued its *Sandoval* ruling (*People v Sandoval*, 34 NY2d 371), permitting the prosecutor to ask nine questions of the defendant concerning the incident, should he take the stand and testify. The parties and the court agreed that the prosecutor could ask:

"1. On February 18, 1993, did you live at 336 West 49th Street?

"2. Were you at that location at 2:50 a.m. on February 18, 1993?

"3. Did you have a verbal dispute with Marie Daniele that started in your apartment and continued on to the staircase between the 1st and 2nd floors at that location?

"4. During that argument did you place your hands on her throat?

"5. When your hands were not on her throat were you trying to pull her back up the staircase.

"6. Did a man by the name of Michael Menard come out of his apartment on the first floor and tell you to stop?

"7. Did you continue to have your hands on her throat or when not on her throat to pull Ms. Daniele up the stairs?

"8. Didn't you continue to pull her and place your hands on her throat until Mr. Menard went back into his apartment and came right back out with a baseball bat and then you released her?

"9. And didn't all of this occur over a period of several minutes?"

When defense counsel requested a ruling on the permissible scope of rebuttal after defendant answered these questions and

volunteered to make an offer of proof of what the defendant's testimony would be, the court declined to so rule in advance. The court noted that its *Ventimiglia* ruling was a "very, very close call" but that the *Ventimiglia* ruling dealing with the People's direct case had little to do with a situation in which the defendant opens the door. The court also noted that testimony does not always accord with the proponent's offer of proof and emphasized that it did not know what defendant would say if he took the stand. In particular, the court noted that it was "entirely possible that based upon [defendant's] testimony some, all or none of the information adduced at the *Ventimiglia* hearing will be admissible." Accordingly, the court found that it would be unfair to provide an advance ruling specifying what rebuttal evidence the People would be permitted to introduce. The defendant did not testify and the jury rejected his "rough sex" accident defense and convicted him of manslaughter in the first degree.

■ The defendant contends that the court deprived him of his right to testify in his own defense by refusing an advance ruling delineating the scope of the People's rebuttal if defendant testified. Initially, while defendant contends upon appeal that the court violated his constitutional rights, such contention is not preserved for review as a matter of law, since defendant did not raise such constitutional objections at trial (CPL 470.05 [2]; *People v Knowles*, 88 NY2d 763, 768, n), and we decline to review such constitutional claim in the interest of justice.

■ The court did not abuse its discretion in refusing to provide defendant with an advance ruling. "No rule for the conduct of trials is more familiar than that the party holding the affirmative is bound to introduce all the evidence on his side before he closes. *(Hastings* v. *Palmer,* 20 Wend., 225.) He must exhaust all his testimony in support of the issue on his side, before the testimony on the opposite side has been heard. *(Ford* v. *Niles,* 1 Hill, 301; *Rex* v. *Stimpson,* 2 Carr & P., 415.) He can afterwards introduce evidence in rebuttal only. Rebutting evidence in such cases means, not merely evidence which contradicts the witnesses on the opposite side and corroborates those of the party who began, but evidence in denial of some affirmative fact which the answering party had endeavored to prove." *(Marshall v Davies,* 78 NY 414, 420 [Rapallo, J.].)

"The basic rule is well settled in this State that a criminal defendant, as a witness, places himself or herself in the position of any other witness, having the same duties and exposures

* * * The rule includes a defendant-witness being 'asked questions disclosing his past life and conduct, and thus impairing his credibility' * * * as well as questions relative to the issue, even though injurious to the defense" (*People v Betts*, 70 NY2d 289, 292, quoting *People v Casey*, 72 NY 393, 398-399).

Defendant, at trial, called the possibility of his testifying without an advance ruling a "crap-shoot." While, perhaps inelegant, the phrase is succinct and correctly describes the dilemma, uncertainty and gamble every defendant faces when he takes the stand and places his or her credibility in issue. However, the defendant herein cites no rule permitting a defendant to determine, in advance, the scope of the prosecutor's evidence on rebuttal, in order to lessen that gamble. "The policy of protecting the defendant's opportunity to testify, while allowing the prosecution a balanced evidentiary response, is well served by the rule that the defendant's choice to testify in the case on trial does not, by itself, effect a waiver of the privilege against self-incrimination as to pending unrelated charges. This rule will not, on the other hand, preclude prosecutors from inquiry into pending criminal charges if a defendant, in taking the stand, makes assertions that open the door and render those charges relevant for contradiction and response." (*Supra*, at 295.)

In *People v Matthews* (68 NY2d 118), the Court of Appeals acknowledged that it was logical and fair to place the burden on the People of obtaining an advance ruling on the admissibility of other crimes sought to be introduced in evidence as part of the prosecutor's own direct case but found that there was no reason to generally shift the burden to the prosecutor when he only intends to use such evidence if the defendant testifies on his own behalf. "The decision to testify is entirely within the control of the defendant who should anticipate cross-examination regarding prior criminal or immoral acts, and can generally prevent any prejudice by moving to prohibit or limit questioning on these matters before he takes the stand" (*supra,* at 123).

The court complied with this prevention of possible prejudice by specifically limiting the questions the prosecutor could ask about the prior incident (*see, supra*). Although the defendant herein volunteered to make an offer of proof as to the content of his testimony at the time the advance ruling was requested, the exact wording of his testimony was not, nor could be known. As the court observed, testimony might diverge sharply from an offer of proof, and providing the defendant with the

opportunity to tailor his testimony to the anticipated rebuttal without fear of refutation would not serve to preserve the truth-seeking process, nor did denial of such an opportunity in any way deprive him of the right to testify. A defendant by his direct testimony necessarily risks opening the door to impeachment (*People v Wise*, 46 NY2d 321).

The defendant's reliance on *People v Ventimiglia (supra)* and *People v Sandoval (supra)* in support of his contention that he was entitled to an advance ruling is misplaced. In *Ventimiglia*, the Court of Appeals set forth rules regarding the introduction of evidence of the defendant's uncharged crimes on the People's direct case. In *Sandoval*, the Court considered the procedural and substantive rights of a defendant to obtain a prospective ruling as to the permissible scope of cross-examination concerning the prior commission of specific criminal, vicious and immoral acts, on the basis of which the defendant would decide whether or not to take the witness stand in his or her own defense. In contrast, in the instant case, the defendant was asking the court to determine whether his testimony would lead to further proof of uncharged crimes, before he even took the stand. Neither *Ventimiglia* nor *Sandoval* requires the court to make an advance ruling on the scope of rebuttal evidence the People will be permitted to introduce should the defendant take the stand. On the contrary, both a *Ventimiglia* and a *Sandoval* ruling may be reopened, after the defendant has testified, to allow additional evidence of uncharged misconduct if the defendant opens the door on direct testimony (*see, People v Fardan*, 82 NY2d 638, 645-646).

Accordingly, the judgment of the Supreme Court, New York County (Franklin Weissberg, J.), rendered December 12, 1994, convicting defendant, after trial by jury, of manslaughter in the first degree, and sentencing him to $8^1/_3$ to 25 years, should be affirmed.

WALLACH, J. P., RUBIN and WILLIAMS, JJ., concur.

Judgment, Supreme Court, New York County, rendered December 12, 1994, affirmed.