People v Vasquez (2020 NY Slip Op 02237)





People v Vasquez


2020 NY Slip Op 02237


Decided on April 9, 2020


Appellate Division, First Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on April 9, 2020

Manzanet-Daniels, J.P., Gesmer, Oing, Moulton, González, JJ.


10827 967/12

[*1] The People of the State of New York, Respondent,
v
Luis Vasquez, Defendant-Appellant.


Christina A. Swarns, Office of the Appellate Defender, New York (Stephen R. Strother of counsel), for appellant.
Luis Vasquez, appellant pro se.
Darcel D. Clark, District Attorney, Bronx (Jennifer L. Watson of counsel), for respondent.



Judgment, Supreme Court, Bronx County (Patricia DiMango and Patricia Anne Williams, JJ. at CPL article 730 proceedings; Thomas E. Moran, J. at jury trial and sentencing), rendered October 18, 2013, convicting defendant of robbery in the first degree (two counts) and assault in the first degree, and sentencing him, as a second felony offender, to an aggregate term of 25 years, unanimously affirmed.
The jury convicted defendant based on his participation in a shooting and robbery. The other participants were defendant's friend Francisco Calderon, Sonia Hernandez and Yahaira Diaz. The two women testified that they had been persuaded to ride along by defendant's promise that they would share the money stolen from the victim. Calderon testified that the presence of the two women would reduce suspicion as they waited for the victim to appear.
On the day of the shooting and robbery, defendant drove his girlfriend's dark green Ford Explorer SUV to 1365 LaFayette Avenue in the Bronx. Both Diaz and Hernandez testified to what happened after all four got into the SUV. While driving to the scene, defendant told the others that a "Chinese man" walking with a bag would be their target. The four waited in the parked SUV for approximately two hours. When the victim emerged from the building, defendant identified him as "the Chinese man,"[FN1] and Calderon got out of the car. Diaz followed. After a struggle, Calderon shot the victim three times, took the bag, and returned to the car with Diaz. Diaz testified that as the SUV sped away from the scene, both defendant and Hernandez repeatedly said, "We won." Calderon threatened to kill the women if they discussed the crime with anyone.
Unbeknownst to defendant and the others, a retired sanitation worker driving his own car in the vicinity saw Calderon holding a gun while standing next to Diaz. The witness testified that he heard gunshots and saw another man fall to his knees. After Calderon and Diaz got back in the vehicle with defendant and Hernandez, the witness followed the SUV and called 911. The witness estimated that defendant was driving approximately 60 miles per hour. Eventually, the witness saw a police van, which was responding to the radio run about the shooting and robbery, and pointed out the SUV to the officers. He told the officers that at least one of the occupants had a gun.
The officers activated their lights and siren and pulled the SUV over. The officers directed the occupants of the SUV to throw the car keys out the window and place their hands outside the SUV. According to Diaz and Hernandez, defendant instead threw Diaz's house keys [*2]out of the driver side window and then sped away as the officers exited their van.
The chase continued. Hernandez testified that Calderon threw the gun out of the SUV. At one point, defendant pulled over to let Calderon and Diaz out of the car. Eventually defendant drove the SUV into a bus depot parking lot and was cornered. Defendant jumped out of the SUV, climbed a fence, and fled. Police recovered his wallet from the SUV. Defendant was arrested approximately 18 months later.
Hernandez and Diaz testified against defendant at trial pursuant to cooperation agreements, after pleading guilty to third degree grand larceny and third degree robbery, respectively. Calderon pleaded guilty to first degree robbery to cover five robberies committed in September 2010, including the instant offense.
Calderon testified for the defense. He attempted to exculpate defendant by claiming that the robbery was his idea, and that he did not tell defendant or the others that he was going to rob the victim. Instead, he told them he needed a ride to apply for a job. Calderon testified that he compelled defendant under gunpoint to drive away from the scene. The jury convicted defendant as described above.
Defendant raises several issues on appeal. We find that none warrant reversal.
In the circumstances presented, defendant was not entitled to a third CPL article 730 examination, and there was no violation of the procedural requirements of that article. Examining psychiatrists had twice reported that defendant was competent, that he was malingering, and that his records did not show a history of psychiatric treatment or symptoms. Justice DiMango agreed with the examiners that defendant was malingering, but nevertheless acquiesced to defense counsel's request for a third exam. However, the examiners submitted addenda to their earlier reports, adhering to their conclusion that defendant had been malingering, and finding that a further exam would be a waste of resources. When the parties next appeared before Justice Williams, she providently exercised her discretion in determining that a third exam was no longer needed. The record supports her determination, made upon review of the prior reports, observations of defendant in court, and consideration of defense counsel's representations of defendant's conduct, that defendant was malingering and that there was no reasonable ground to believe that he was an incapacitated person (see e.g. People v Mendez, 306 AD2d 143, 143 [1st Dept 2003], lv denied 100 NY2d 622 [2003]; see also People v Wyche, 21 AD3d 281 [1st Dept 2005], lv denied 6 NY3d 761 [2005]). Nothing in the record casts any doubt on defendant's competency. People v Armlin (37 NY2d 167 [1975]), cited by defendant, does not deprive a court of all discretion to dispense with a previously granted examination (see People v Washington, 171 AD3d 458, 459 [1st Dept 2019], lv denied 34 NY3d 939 [2019]).
The trial court's denial of defense counsel's request for time to speak to Calderon, who was incarcerated, before he was called to the stand was a provident exercise of discretion under all the circumstances. In any event, any error in this regard was harmless for several reasons. Counsel already knew the content of Calderon's anticipated testimony, and Calderon testified in accordance with the information he had already supplied to counsel. There is no indication that Calderon was insufficiently prepared to testify. As discussed at greater length below, the evidence overwhelmingly established that defendant knowingly, rather than unwittingly, acted as an active participant in the robbery. We also find that the court's ruling had no adverse effect on defendant's right to a fair trial, to present a defense, or to effective assistance of counsel.
The court properly discharged a deliberating juror and replaced her with an alternate upon defendant's written consent, executed in open court (see CPL 270.35[1]). The court conducted an adequate inquiry, by phone, into the reason for the juror's absence, and ascertained the juror's health issues, including high blood pressure, and that she had a doctor's note confirming her medical unfitness to continue deliberating. Defendant then personally consented to her discharge and stated his desire not to force her to continue deliberating. Defendant's written consent to her discharge was made knowingly, voluntarily and intelligently after the court offered numerous times to call the juror again and instruct her to return to the courthouse, after defendant received ample time to confer with counsel, and after defense counsel confirmed that he had reviewed the waiver with defendant and had explained that they could talk further with the juror or agree to substitute an alternate juror. Although defendant at one point claimed to have been pressured, he [*3]expressly stated that he still wanted to replace the juror.
We agree with the dissent that the prosecutor improperly cross-examined Calderon concerning three other crimes in which he had left the scene in a dark SUV. Some of the questions included a partial or complete recitation of the license plate number of the SUV used in the instant crime. This was a clear attempt to associate defendant with uncharged crimes, and the court should have sustained defense counsel's objections to this line of questioning. Similarly, the prosecutor should not have made two references in her summation to the use of this "getaway vehicle" in other crimes when discussing Calderon's testimony.
However, these errors were harmless in light of the overwhelming evidence of defendant's guilt. Diaz and Hernandez both testified that defendant invited them to the robbery with the promise that they would share in the proceeds. They both testified that defendant identified the "Chinese man" who was the mark. Defendant exclaimed, "We won," when Calderon returned to the car with the victim's money. After leaving the scene he drove recklessly at high speed. Both women testified that when the SUV was initially stopped by the police, defendant threw Diaz's house keys out of the car window and sped away to evade capture. If he had been coerced into acting as getaway driver, as Calderon claimed, defendant had the opportunity to explain that to police on two occasions: after he let Calderon and Diaz out of the car, and when he was cornered in the bus depot parking lot.
The dissent characterizes the testimony of the two women as that of culpable accomplices who received favorable plea bargains, but the jury credited their testimony over Calderon's attempt to exculpate defendant. It was for the jury to weigh these competing narratives.
The evidence at trial demonstrates that there is no "significant probability, rather than only a rational possibility," that the jury would have acquitted defendant had it not been for the references to the SUV's connection with Calderon's other crimes (People v Crimmins, 36 NY2d 230, 242 [1975]; see also People v Baines, 178 AD3d 476, 477 [1st Dept 2019] [erroneous admission of uncharged crimes evidence was harmless]; People v Chapman, 101 AD3d 406, 406 [1st Dept 2012] [assuming that admission of uncharged crime evidence was improper, it was "harmless in the face of the overwhelming proof of defendant's guilt"], lv denied, 20 NY3d 1097 [2013]).
We perceive no basis for reducing the sentence.
We have considered and rejected defendant's pro se arguments.
All concur except Manzanet-Daniels, J.P. and Gesmer, J. who dissent in a memorandum by Manzanet-Daniels, J.P. as follows:




MANZANET-DANIELS, J. (dissenting)


The trial court's failure to circumscribe the prosecutor's cross-examination of defense witness Calderon left the jury with the impression that defendant had participated with Calderon in uncharged robberies. This, in conjunction with the prosecutor's argument in summation that defendant and Calderon were involved in a "spree" of other uncharged robberies, deprived defendant of a fair trial on the charges in this case (see People v Ventimiglia, 52 NY2d 350, 359 [1981]). Because the evidence was not so overwhelming as to render these errors harmless, I would reverse the judgment and remand the matter for a new trial.
When a defendant is tried for one offense, "he is to be convicted, if at all, by evidence which shows that he is guilty of that offense alone, and that, under ordinary circumstances, proof of his guilt of one or a score of other offenses in his lifetime is wholly excluded" (People v Wilkinson, 71 AD3d 249, 253 [2d Dept 2010] [internal quotation marks omitted]; see Ventimiglia, 52 NY2d at 359). Proof of uncharged crimes may be admitted for certain narrow purposes, but it "may not be admitted solely to demonstrate a defendant's bad character or criminal propensity" (People v Blair, 90 NY2d 1003, 1004-05 [1997] [testimony concerning an alleged drug transaction occurring eight months earlier did nothing to refute the defendant's claim that he had been framed, but served only to show his propensity to sell drugs, and thus was inadmissible]); Wilkinson, 71 AD2d at 255 [evidence of uncharged sales on other occasions "is rarely if ever admissible merely to complete the narrative"] [internal quotation marks omitted]).
Under the guise of impeaching Calderon's credibility, the prosecutor repeatedly implied to the jury that defendant was the "getaway" driver for Calderon in a string of violent robberies. [*4]The prosecutor began by asking Calderon, during cross, if he was aware that the license plate on defendant's SUV was "[EVD] 4556." Although Calderon replied that he was not aware, the prosecutor proceeded to ask detailed questions about multiple other robberies Calderon had committed in September 2010 — robberies that were not at issue in defendant's trial. The prosecutor asked Calderon if, on September 11, 2010, he entered the Rosa Beauty Salon on the Grand Concourse and robbed people at gunpoint, before "flee[ing] from that scene in a dark SUV with the partial plate number [EVD] 6." The prosecutor asked Calderon if, on September 16, 2010, he entered the Mi Amiga Beauty Salon and "pointed a gun at the head of an eight-year[]-old boy and threatened to shoot him," before robbing several people at gunpoint. The prosecutor asked if he had "fled" the scene of the robbery "in a dark SUV which contained partial plate number 4556." The prosecutor asked Calderon if, on September 18, 2010, he and another male Hispanic entered Mi Estrellita Beauty Parlor, armed with a silver gun and a knife, and "robbed several people at gunpoint," before "fle[eing] in a dark Ford Explorer going northbound on Morris Avenue from East Treemont Avenue."
This testimony left the jury with the impression that defendant — whose girlfriend owned a 2003 Ford Explorer with license plate EVD 4556 — participated in these uncharged robberies.
The color, model, and license plate of Calderon's alleged getaway car in the other cases were not pertinent to this case. Rather, by going seriatim through Calderon's crimes and questioning him regarding license plate numbers, the prosecutor was trying to implicate defendant by suggesting that he drove Calderon to and from those other robberies (see e.g. People v Ortiz, 69 AD3d 490, 491 [1st Dept 2010] [prosecutor's reference to the defendant's girlfriend's criminal record served no other purpose but "to suggest that defendant was associated with a disreputable person"]). The prosecutor in this case was "invit[ing] [the] jury to misfocus" on defendant's purported guilt in Calderon's other robberies instead of on the evidence relating to the case before it (People v Rojas, 97 NY2d 32, 36-37 [2001]). This is exactly the kind of propensity evidence that may not be admitted at trial (see People v Blair, 90 NY2d 1003).
Worsening matters, the prosecutor argued during summation that Calderon's "getaway vehicle" for the commission of his other robberies was defendant's "dark green SUV." Indeed, without any basis in the record, he asserted that Calderon's "getaway vehicle of choice" was "that dark green SUV."
The evidence of defendant's guilt was not so overwhelming that these errors may be deemed harmless (see People v Crimmins, 36 NY2d 230 [1975]). Defendant did not participate in the robbery itself, and was at most alleged to be a "getaway driver." He was not found with fruits of the crime; indeed, he was implicated on the word of more culpable accomplices who received beneficial plea bargains. Because the evidence of prior uncharged crimes served no legitimate purpose and the error in its admission cannot be deemed harmless, the judgment should be reversed and the matter remanded for a new trial.
THIS CONSTITUTES THE DECISION AND ORDER
OF THE SUPREME COURT, APPELLATE DIVISION, FIRST DEPARTMENT.
ENTERED: APRIL 9, 2020
CLERK



Footnotes

Footnote 1:The victim is of Korean heritage.