People v Giacopelli (2024 NY Slip Op 50869(U))

[*1]

People v Giacopelli

2024 NY Slip Op 50869(U)

Decided on July 9, 2024

County Court, Putnam County

Mole, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on July 9, 2024
County Court, Putnam County

The People of the State of New York,

against
Paul Giacopelli, Defendant.

Indictment No. 70074-24

GAITMAN & RUSSO LLP
Attn: Steven J. Gaitman, Esq.
Attorneys for Defendant Paul Giacopelli
666 Old Country Road — Suite 207
Garden City, NY 11530 

PUTNAM COUNTY DISTRICT ATTORNEY'S OFFICE
Attn: ADA Melissa Lynch
40 Gleneida Avenue
Carmel, NY 10512

Anthony R. Molé, J.

The following papers were read and considered on the omnibus motion (Mot. Seq. No. 1) made by PAUL GIACOPELLI (hereinafter defendant):
Papers:
1. Notice of Motion; Affirmation in Support; Exhibit A
2. People's Affirmation in Response; Exhibit A 3. Transcript of the Grand Jury Minutes from March 22, 2024; Grand Jury Exhibits 1-7
Upon review of the foregoing papers, the Court finds and determines as follows:
On March 29, 2024, defendant was charged in a multi-count indictment with sexual abuse in the first degree in violation of Penal Law § 130.65 (2) (four counts); forcible touching in violation of Penal Law § 130.52 (1) (four counts); assault in the second degree in violation of Penal Law § 120.05 (5) (four counts); and criminal possession of a controlled substance in the third degree in violation of Penal Law § 220.16 (2) (one count). The underlying charges stem from accusations by a female complainant, who was employed as a residential nanny by [*2]defendant—a licensed anesthesiologist. According to the indictment, defendant on four separate occasions, drugged the complainant with an anesthetic drug while she was asleep in his home and sexually abused her when she was unconscious.
Defendant was arraigned on April 30, 2024, when he entered a not guilty plea. By an Order dated May 30, 2024, the undersigned granted the People's motion to compel defendant to submit to a buccal saliva swab in order to collect his DNA sample for analysis in connection with the underlying charges (see CPL 245.20 [1] [e]; Matter of Abe A., 56 NY2d 288, 291 [1982]).
On June 3, 2024, defendant filed his omnibus motion requesting various associated relief. The People, in turn, filed their responsive papers on June 18, 2024. Defendant elected not to file reply papers and rests on his initial moving papers.
His omnibus motion is thus fully submitted and ripe for determination. The Court will address each branch of defendant's motion, in turn, and dispose of it as follows:
I. Defendant's Motion for Inspection of the Grand Jury Minutes
Initially, defendant moves for an inspection of the grand jury minutes. The People consent to have the Court review the grand jury minutes, in camera, for legal sufficiency purposes and represent that they have provided a copy of the minutes to the Court and defense counsel for such purpose. Accordingly, this branch of defendant's motion is moot. The Court has inspected the minutes of the grand jury proceeding relative to this case (see CPL 210.30 [3]; CPL 245.20; see also People v Calbud, Inc., 49 NY2d 389, 394-395 [1980]; People v Monserrate, 24 Misc 3d 1229[A], *1 [Sup Ct, Queens County 2009]).
II. The Grand Jury Proceeding
Next, defendant requests the Court to inspect the grand jury minutes for purposes of determining, inter alia, legal sufficiency of the evidence, proper instructions and legal charges, and whether there were any flaws in the process and proceeding so as to impair its integrity. Defendant requests in such event that the indictment be dismissed or potentially reduced.
The People counter that the evidence presented to the grand jury was legally sufficient in all respects to support the charged offenses. They maintain that the integrity of the proceeding was not impaired by hearsay evidence or minor flaws and errors since there was no prejudice to defendant. The Court agrees with the People in sustaining the indictment for the reasons that follow.
a. Legal Standard
It is well settled that on a motion to dismiss an indictment based on the alleged legal insufficiency of the evidence before the grand jury, the Court must determine whether there is "competent evidence which, if accepted as true, would establish every element of an offense charged and the defendant's commission thereof" (CPL 70.10 [1]; see People v Jensen, 86 NY2d 248, 251-252 [1995]). "Courts assessing the sufficiency of the evidence before a grand jury must evaluate whether the evidence, viewed most favorably to the People, if unexplained and uncontradicted—and deferring all questions as to the weight or quality of the evidence—would warrant conviction" (People v Mills, 1 NY3d 269, 274-275 [2003] [internal quotation marks and citation omitted]; accord People v Wisey, 133 AD3d 799, 799-800 [2d Dept 2015]).
"In the context of a Grand Jury proceeding, legal sufficiency means prima facie proof of the crimes charged, not proof beyond a reasonable doubt. The reviewing court's inquiry is limited to whether the facts, if proven, and the inferences that logically flow from those facts supply proof of every element of the charged crimes, and whether the Grand Jury could [*3]rationally have drawn the guilty inference. That other, innocent inferences could possibly be drawn from those facts is irrelevant to the sufficiency inquiry as long as the Grand Jury could rationally have drawn the guilty inference" (People v Wisey, 133 AD3d at 800 [internal quotation marks and citations omitted]; see People v Deegan, 69 NY2d 976, 979 [1987]). "Inquiry into the adequacy of the proof to establish reasonable cause—the 'degree of certitude' the evidence provides—is exclusively the province of the Grand Jury" (People v Swamp, 84 NY2d 725, 730 [1995]; see CPL 190.65 [1] [b]).
Importantly, "[i]t is sufficient if the [prosecutor] provides the Grand Jury with enough information to enable it intelligently to decide whether a crime has been committed and to determine whether there exists legally sufficient evidence to establish the material elements of the crime. The People have wide discretion in presenting evidence to establish their case and do not have the obligation to present to the Grand Jury every piece of evidence which they possess against a suspect, nor must every matter which may have a tendency to reflect upon the credibility of a witness be revealed. The Grand Jury proceeding is not intended to be adversarial in nature or a minitrial of the individual suspected of committing a crime" (People v Shahzad, 71 AD3d 704, 705-706 [2d Dept 2010] [internal quotations marks and citations omitted] [emphasis added]; see People v Colucci, 32 AD3d 1044, 1045 [2d Dept 2006]; People v Suarez, 122 AD2d 861, 862 [2d Dept 1986], lv denied 68 NY2d 817 [1986]).
Moreover, the Court of Appeals has expressed that CPL 210.35 (5) establishes a "high test" to qualify for the "exceptional remedy" of dismissing an indictment: "[t]he statutory test is very precise and very high" (see People v Darby, 75 NY2d 449, 455 [1990]). "[M]ere flaw, error[,] or skewing" is not enough (id.).
"Generally, hearsay evidence is inadmissible before the Grand Jury" (People v Dunn, 248 AD2d 87, 94 [1st Dept 1998], appeal withdrawn 93 NY2d 1002 [1999]; see People v Huston, 88 NY2d at 406-407). However, "hearsay evidence may be admitted before the Grand Jury so long as the resulting indictment[ ] [is] not founded on hearsay which the Grand Jury 'may not have understood as such'" (People v Perry, 199 AD2d 889, 893 [3d Dept 1993], quoting People v Pelchat, 62 NY2d 97, 106 [1984]). Errors in admission of hearsay evidence must be of a significant magnitude to impair the integrity of grand jury proceedings (see People v Carey, 241 AD2d 748, 750-751 [3d Dept 1997], lv denied 90 NY2d 1010 [1997]). Even "isolated instances of hearsay testimony, which were accompanied by appropriate limiting instructions, do not warrant dismissal" of the indictment (People v Miller, 110 AD3d at 1150-1151) — so long as there is otherwise legally sufficient and admissible evidence to sustain the counts of the indictment.
b. The Grand Jury Proceeding
Applying these legal standards to the case at hand, the Court finds that the evidence presented to the grand jury, when viewed in the light most favorable to the People, was legally sufficient to establish the criminal offenses charged in the indictment (see CPL 70.10 [1]; People v Mills, 1 NY3d 269, 274-275 [2003]; People v Wisey, 133 AD3d at 799-801). Defendant's blanket assertion that indictment is, or may be, grounded upon legally insufficient evidence is without merit (see People v Williams, 150 AD3d 1273, 1279 [2d Dept 2017], lv denied 29 NY3d 1135 [2017]; People v Santos, 21 Misc 3d 360, 370-371 [Sup Ct, Nassau County 2008]).
The Court initially points out that the minutes reflect that a quorum of grand jurors was present at the beginning of the proceeding and before the grand jury voted to deliberate on the charges (see People v Huston, 88 NY2d at 409; People v Robinson, 156 AD3d 1123, 1128 n 8 [*4][3d Dept 2017], lv denied 30 NY3d 1119 [2018]). The entire proceeding started and finished the same day. None of the grand jurors had any questions for the witnesses who testified before them. Defendant's due process rights were not violated during the grand jury process. Nor does the court find that the proceeding itself was somehow infected.
As to defendant's challenge to the legal sufficiency of the evidence presented to the grand jury, the female complainant testified that she was a former nanny for the defendant. She stated that defendant is married to his wife and has twin children. The complainant testified that she worked as a nanny for defendant from September 2020 to December 2023, providing residential childcare for defendant's children who have special needs. She stated that her work hours in that role were Monday to Friday mornings, and about one or two overnight shifts when she would sleep over defendant's residence. The complainant explained that she worked overnight shifts usually when defendant was "on call at the hospital" based on his occupation as an anesthesiologist.
The complainant recounted four separate nights in late 2023. She described that she worked overnight shifts at defendant's residence babysitting the children and after she fell asleep, she woke up to a rag being held over her face, smelled "chemicals," and then she "blacked out" about two or three seconds later.
Notably, the complainant testified that while working an overnight shift at defendant's home during the night of December 29, 2023, she brought an "Arlo" security camera and placed it in a concealed location in the room she was sleeping in. The complaint stated that she at some point became suspicious of something, thus prompting her to video record herself while she was asleep. Specifically, the complainant testified that she placed the camera "next to the turtle tank behind the dehumidifier for the turtle tank, so [defendant] could not see it." The complainant explained to the grand jury that she went to sleep and awoke briefly to a rag over her face, smelled chemicals, and she suddenly blacked out. The complainant testified that she viewed the contents of the video camera at approximately 2 a.m. on the morning of December 30, 2023. The Arlo security camera set up by the complainant recorded nine clips which were placed on a USB thumb drive, played for the grand jury, and admitted into evidence as an exhibit.
The complainant confirmed that the nine video clips on the thumb drive fairly and accurately depicted the room in defendant's residence that she was sleeping in during the night of December 29 and 30, 2023. She identified herself and defendant on the video clips. It goes without saying that the grand jurors concluded that the footage on the video clips speaks for itself. The complainant stated that she woke up around 8 a.m. the following morning, immediately left defendant's residence, went to a hospital with her father, contacted police and she spoke to Keith Simone, a criminal investigator with the Putnam County Sheriff's Office. After the complainant finished testifying, none of the grand jurors had any questions for her.
In addition, Investigator Simone testified that he was assigned to investigate allegations of a sexual nature against defendant. Simone stated that he interviewed the complainant and defendant, separately, in connection with the investigation. Simone recounted for the grand jury the interview with defendant on December 30, 2023, stating that defendant was taken to an interview room in the Sheriff's Office; and that defendant told him that he filled a white rag with Sevoflurane, an anesthetic agent, and covered the complainant's mouth and nose to render her unconscious.
Simone went on to detail to the grand jury the conversation during defendant's interview, during which defendant told him that he touched the complainant's body and breast with his [*5]hands and penetrated the complainant's vagina with his fingers. Specifically, Simone testified that defendant stated during the interview that he made the complainant unconscious and he "used his fingers to go inside [the complainant's] vagina." Simone also testified about defendant's admissions that he engaged in such conduct "approximately four [different] times." Simone further testified that defendant essentially confessed to the crimes during his interview, admitting that he has a "Chloroform fetish," and that the complainant was the "easiest target" because she is a "heavy sleeper."
Simone also explained to the grand jury that defendant, while the Chief Anesthesiologist at Putnam County Hospital, transported various drugs and narcotics from the hospital to his residence since he felt it was "okay to bring [them] home." Simone testified that as a result of the criminal investigation, search warrants were executed of defendant's residence on December 30, 2023, ultimately resulting in a discovery of an "assortment of narcotics" packaged in hospital vials which included Fentanyl and Midazolam. Simone was present for execution of the search warrant. The grand jury was shown five photographs taken by police of the substances that were recovered at defendant's home as a result of the search warrant — some of which depicted vials labeled Fentanyl Citrate. Simone testified that the substances found in defendant's residence were secured in an evidence bag and subsequently transported on January 9, 2024 to the Mid-Hudson Satellite Crime Laboratory for forensic testing.
The grand jury was shown a copy of a document entitled "Seized Drugs Report" in connection with this case. The report reflects that eight glass vials found in defendant's home were tested and the substances seized tested positive for the presence of fentanyl, with an aggregate weight of 16.442 grams. That report was certified by a forensic scientist with Mid-Hudson Satellite Crime Laboratory and signed by the supervisor of forensic services. The prosecutor specifically instructed the grand jury not to consider any of the other drugs that were discovered in defendant's home because Fentanyl Citrate was the only substance that was sent for laboratorial forensic testing.
The prosecutor instructed the grand jury on the law, providing legal definitions and explanations. Afterwards, the grand jury secretly deliberated and voted a true bill on all of the counts submitted. Critically, "[a] grand jury 'need not be instructed with the same degree of precision that is required when a petit jury is instructed on the law'" (People v Ruvalcaba, 187 AD3d 1553, 1554 [4th Dept 2020], lv denied 36 NY3d 1053 [2021] [internal brackets omitted], quoting People v Calbud, Inc., 49 NY2d at 394-395). Here, the Court notes that the prosecutor's instructions to the grand jury comported with the charged offenses, since the prosecutor read the statutory text contained in the penal statutes — which the grand jury apparently construed based on the text's most natural and obvious meaning. In addition, the prosecutor read certain definitions and instructions to the grand jury at length, and advised it about burdens of proof and the primary function of that body. The Court finds that the legal instructions provided by the prosecutor to the grand jury adequately enabled it to make an informed and intelligent decision as to whether an indictment was authorized (see People v Hart, 25 AD3d 815, 816 [3d Dept 2006], lv denied 6 NY3d 834 [2006]).
Upon examining the grand jury minutes and the totality of the proceeding, the Court concludes that the evidence presented to the grand jury, when viewed in the light most favorable to the People, was legally sufficient to establish the criminal offenses charged (see CPL 70.10 [1]; People v Mills, 1 NY3d 269, 274-275 [2003]; People v Wisey, 133 AD3d at 799-801). The Court further holds that there was no serious irregularity that impaired the integrity of the grand [*6]jury proceeding, so as to create the possibility of prejudice to defendant (see People v Lashua, 264 AD2d 951, 951-952 [3d Dept 1999]).
Relevant here, "[a] person is guilty of sexual abuse in the first degree when [that person] subjects another person to sexual contact . . . [w]hen the other person is incapable of consent by reason of being physically helpless" (Penal Law § 130.65 [2]). "'Sexual contact' means any touching of the sexual or other intimate parts of a person for the purpose of gratifying sexual desire of either party" (id. § 130.00 [3]). With respect to sexual abuse in the first degree, a person is physically helpless if he or she is "unconscious or for any other reason is physically unable to communicate unwillingness to an act" (id. § 130.00 [7]; see id. § 130.65 [2]). Physical helplessness includes drug-induced unconsciousness (see id. § 130.00 [7]). Assault in the second degree, as charged here, requires that "[f]or a purpose other than lawful medical or therapeutic treatment, [defendant] intentionally cause[d] stupor, unconsciousness[,] or other physical impairment or injury to [the victim] by administering to [her], without [her] consent, a drug, substance[,] or preparation capable of producing the same" (id. § 120.05 [5]).
Also applicable here, "[a] person is guilty of forcible touching when such person intentionally, and for no legitimate purpose . . . forcibly touches the sexual or other intimate parts of another person for the purpose of degrading or abusing such person, or for the purpose of gratifying the actor's sexual desire" (Penal Law § 130.52 [1] [emphasis added]).
In this case, the Court finds that the grand jury evidence is legally sufficient to sustain all 13 counts of the indictment. Regarding the charges of sexual abuse in the first degree and forcible touching, the video clips generated from the camera that was planted by the complainant in defendant's home, coupled with her and Simone's testimonies, established the legitimacy of those charges. The video clips showed that while the complainant was asleep, defendant used a rag over her mouth and made sexual contact with her while she was physically helpless and unable to consent to such conduct. The complainant's testimony was further corroborated by defendant's confession during his interview when he admitted that he engaged in similar conduct on three prior occasions in the past by using an anesthetic drug to render the complainant unconscious. Moreover, defendant admitted during his interview that as an anesthesiologist working at a hospital, he had liberal access to various narcotic drugs.
Furthermore, the drug-based assault charges are based on the grand jury's conclusion that defendant used an anesthetic drug upon the complainant that was capable of producing "stupor, unconsciousness or other physical impairment or injury to another person" (Penal Law § 120.05 [5]). Defendant confessed to police that he used Sevoflurane on the victim several times.
The definition of "drug" includes, among other things, "something[,] and often an illegal substance[,] that causes addiction, habituation, or a marked change in consciousness" (Merriam—Webster Online Dictionary, https://www.merriam-webster.com/dictionary/drug [last accessed July 6, 2024] [emphasis added]). According to the National Institutes of Health (NIH), Sevoflurane — approved by the Food and Drug Administration — is a "halogenated inhalational anesthetic" used for general anesthesia; and is characterized as "a volatile anesthetic that provides hypnosis, amnesia, analgesia, akinesia, and autonomic blockade," reducing "systemic vascular resistance" and "the cerebral metabolic rate" (Sevoflurane, National Institutes of Health, available at https://www.ncbi.nlm.nih.gov/books/NBK534781/#:~:text=and%20outpatient%20surgery.-,Sevoflurane%20is%20a%20volatile%20anesthetic%20that%20provides%20hypnosis%2C%20amnesia%2C%20analgesia,inadequate%20pre%2Dinduction%20intravenous%20access [last [*7]accessed July 6, 2024]).
The complainant's testimony demonstrated her degree of impairment, as she only vaguely recalled smelling some sort of chemicals and then suddenly blacking out after a rag was placed over her nose and mouth. The grand jury was presented with ample evidence — namely, the video clips recorded from her concealed camera and the drugs recovered from defendant's residence — from which they could naturally conclude that the complainant's stuporous condition stemmed, in large part, from defendant drugging her unconscious with some sort of substance. Accordingly, the Court is satisfied that the drug-based assault charges are supported by legally sufficient evidence (see Penal Law § 120.05 [5]; cf. People v Bonaparte, 196 AD3d 866, 867-868 [3d Dept 2021], lv denied 37 NY3d 1025 [2021]; People v Elmy, 117 AD3d 1183, 1183-1186 [3d Dept 2014]).
Therefore, the grand jury could logically infer that defendant used an anesthetic drug upon the complainant and defendant's sexual touching of the complainant while she was unconscious was to gratify his sexual desire. The grand jury had a valid line of reasoning to support the conclusion that defendant touched the complainant's breast and vagina in pursuit of sexual gratification.
In any event, the Court notes that neither sexual abuse in the first degree nor forcible touching requires the complainant's physical helplessness to have been caused by drugs (see Penal Law §§ 130.52 [1], 130.65 [2]; People v Edison, 167 AD3d 769, 770 [2d Dept 2018], lv denied 33 NY3d 947 [2019]). The complainant's testimony that she was unconscious when defendant sexually assaulted her provided a basis for the grand jury to find that she was "incapable of consent by reason of being physically helpless" (Penal Law § 130.65 [2]).
As to the single drug count, "[a] person is guilty of criminal possession of a controlled substance in the third degree when he [or she] knowingly and unlawfully possesses" a substance containing a narcotic drug that has "an aggregate weight of one-half ounce or more" (Penal Law § 220.16 [12]). Here, the evidence presented to the grand jury consisted of, inter alia, Simone's testimony and a forensic crime lab report, which confirm that the substance found in defendant's residence pursuant to a search warrant tested positive for Fentanyl (a narcotic drug). The eight glass vials of Fentanyl that were tested, in aggregate, weighed 16.442 grams — which is over a half ounce. One-half ounce is equal to 14.17 grams (see e.g. People v Acevedo, 112 AD3d 985, 986 [3d Dept 2013], lv denied 23 NY3d 1017 [2014]). The Court accordingly finds that legally sufficient evidence was presented to the grand jury in connection with the single count of criminal possession of a controlled substance in the third degree (see Penal Law § 220.16 [12]; People v Patterson, 199 AD3d 1072, 1075-1076 [3d Dept 2021], lv denied 37 NY3d 1163 [2022]; cf. People v Pitterson, 234 AD2d 79, 79 [1st Dept 1996], lv denied 89 NY2d 1014 [1997]).
To the extent that defendant asserts any purported claims of error in the prosecutor's presentation of the case to the grand jury, this Court's review of the grand jury minutes reveals no errors or conduct on the part of the prosecutor that impaired or infected the integrity of the proceeding, or that otherwise prejudiced defendant (see People v Huston, 88 NY2d at 409; People v Nelson, 156 AD3d 1112, 1116 n 1 [3d Dept 2017], lvs denied 31 NY3d 1145, 1151, 1152 [2018]).
The grand jury was entitled to credit or reject all or some of the evidence presented as it determined. The evidence before the grand jury is sufficient to support the subject indictment. Thus, that branch of defendant's motion to dismiss the indictment, or reduce the counts charged, [*8]is denied in its entirety (see CPL 190.65 [1]; People v Jennings, 69 NY2d 103, 115 [1986]).
III. Defendant's Motion to Suppress Statements Made to Police
Next, defendant moves to preclude all of his statements to police, which were recorded or could be used against him, claiming that police obtained his statements in violation of his constitutional rights and CPL 60.45. He further argues that his statements were involuntary inasmuch as police elicited them "by coercion and . . . force," and they were made during custodial interrogation before he was properly issued his Miranda warnings (see Miranda v Arizona, 384 US 436 [1966]). Defendant also contends that his statements ought to be suppressed based on his "illegal seizure" by police on December 30, 2023 that was effectuated without reasonable suspicion or probable cause when he was leaving his workplace. Alternatively, defendant asks for a Huntley hearing to determine the admissibility of his statements to police (see People v Huntley 15 NY2d 72, 78 [1965]).
The People oppose suppression of defendant's post-arrest statements made to police, arguing that his moving papers contain blanket assertions rather than factual allegations that should be sworn to by defendant. The People thus argue that defendant is not entitled to a Huntley hearing.
The People, in addition, contend that defendant's statements to police were made after he was advised of his Miranda rights, which he knowingly, voluntarily, and intelligently waived, and he thereafter made the incriminating statements. Moreover, the People assert that police had probable cause to apprehend defendant on the day in question based on the complainant's detailed accusations that defendant, as her employer, drugged and sexually abused her, coupled with a law enforcement official observing video recordings of one of the incidents.
Defendant's blanket contention that he was arrested without probable cause and that, as a result, his statements to police should be suppressed, is entirely without merit. "Where, as here, an identified citizen accuses another individual of a specific crime, the police possess probable cause to arrest" (People v Sahadeo, 140 AD3d 1093, 1093 [2d Dept 2016], lv denied 28 NY3d 936 [2016]; accord People v Mendoza, 49 AD3d 559, 560 [2d Dept 2008], lv denied 10 NY3d 937 [2008]; see CPL 70.10 [2]).
It is well settled that a suppression motion "must contain sworn allegations of fact" by defendant which, if true, would warrant suppression (People v Bryant, 8 NY3d 530, 533 [2007]; see CPL 710.60 [1]; People v Mendoza, 82 NY2d at 422-429). A court may summarily deny a motion to suppress if the defendant fails to allege a proper legal basis for suppression or if the "sworn allegations of fact do not as a matter of law support the ground alleged" (CPL 710.60 [3] [b]). "The sufficiency of the factual allegations should be (1) evaluated by the face of the pleadings, (2) assessed in conjunction with the context of the motion[,] and (3) evaluated by defendant's access to information" (People v Bryant, 8 NY3d at 533, quoting People v Mendoza, 82 NY2d at 426; see People v Lopez, 5 NY3d 753, 754 [2005]; People v Guzman, 153 AD3d 1273, 1276-1277 [2d Dept 2017]).
"In ruling on a motion to suppress evidence, the court 'is required to grant a hearing if the defendant 'raise[s] a factual dispute on a material point[,] which must be resolved before the court can decide the legal issue' of whether evidence was obtained in a constitutionally permissible manner" (People v Lambey, 176 AD3d 1232, 1234 [2d Dept 2019], quoting People v Burton, 6 NY3d 584, 587 [2006]; see People v Gruden, 42 NY2d 214, 215 [1977]). "If a court does not summarily grant or deny a motion to suppress, 'it must conduct a hearing and make findings of fact essential to the determination thereof'" (People v Harris, 192 AD3d 151, 155 [2d [*9]Dept 2020], quoting CPL 710.60 [4]).
Here, the People filed the CPL 710.30 notice on April 10, 2024, reflecting that defendant's inculpatory statements to Investigator Simone, on December 30, 2023, were video recorded at the office of the Putnam County Sherriff's Department. Defendant was taken there for a police interview. Such notice further reflects that the video recording of defendant's interview was provided to defense counsel on or about January 9, 2024. The People intend to use defendant's incriminating statements at trial.
The record, as presently existing on this motion, reflects that on December 30, 2023, at roughly 4:15 p.m., defendant was approached by Investigator John Kerwick at Putnam County Hospital where he was employed as an anesthesiologist. Investigator Kerwick asked defendant to accompany him to the Sherriff's Office for questioning. Once there, defendant was taken to an interview room and questioned by Investigator Simone. The entire police interview from December 30, 2023 was recorded and spans about 1 hour and 40 minutes, with Simone leaving the interview room a few different times. The video recording is, in effect, a police interrogation of defendant that was provided to this Court for review.
The video shows that the interview commenced shortly after 4:35 p.m. Investigator Simone began by asking defendant basic pedigree information, general questions about his background, and if he knew why he was brought in for questioning. Before probing defendant any further, Simone advised defendant of his Miranda warnings at 4:37 p.m. by reading them from a preprinted Miranda card. Defendant then indicated that he understood his Miranda rights and that he was willing to continue speaking further with Simone. At about 5:05 p.m., defendant begins to orally confess to Simone about the underlying criminal conduct which he is indicted for here. 
"The Miranda rule protects the privilege against self-incrimination and, because the privilege applies only when an accused is compelled to testify, the safeguards required by Miranda are not triggered unless a suspect is subject to custodial interrogation" (People v Paulman, 5 NY3d 122, 129 [2005] [internal quotation marks and citation omitted]). "The standard for assessing a suspect's custodial status is whether a reasonable person innocent of any wrongdoing would have believed that he or she was not free to leave" (id. at 129; see People v. Yukl, 25 NY2d 585, 589 [1969], cert denied 400 US 851 [1970]). "A court evaluating whether an individual was in custody must assess the circumstances existing when the challenged statements were made, considering such factors as the location, length and atmosphere of the questioning, whether police significantly restricted defendant's freedom of action, the degree of defendant's cooperation, and whether the questioning was accusatory or investigatory" (People v Moore, 162 AD3d 1123, 1125 [3d Dept 2018] [internal quotation marks and citation omitted]). The People bear the burden of proving, beyond a reasonable doubt, that a defendant's statements to police were voluntary (see People v Guilford, 21 NY3d 205, 208 [2013]).
It appears here that the police interrogation culminated in defendant's confession. Defendant was given Miranda warnings. Of note, the adequacy of the warnings are not being challenged by defendant on this motion.
"[T]he purpose of CPL 710.30 is to inform a defendant that the People intend to offer evidence of a statement to a public officer at trial so that a timely motion to suppress the evidence may be made" (People v Rodney, 85 NY2d 289, 291-292 [1995]). To that end, the general purpose of a Huntley hearing is for a court to review evidence in determining whether statements made by defendant to law enforcement are admissible at trial (see People v Huntley [*10]15 NY2d at 78).
In a motion to suppress a statement, all that is needed to warrant a Huntley hearing is the claim that the defendant's statement was involuntary (see People v Acosta, 150 AD2d 166, 167 [1st Dept 1989]; People v Bingham, 144 AD2d 682, 682 [2d Dept 1988]). Moreover, a Huntley hearing is mandatory even if the statement is used solely for impeachment purposes (see People v Clemons, 166 AD2d 363, 365 [1st Dept 1990]; cf. People v Maerling, 64 NY2d 134, 142 [1984]); see also People v Ashley, 15 Misc 3d 80, 82 [App Term, 2d Dept, 9th & 10th Jud Dists 2007], lv denied 8 NY3d 863 [2007] ["while oral statements which have been suppressed pursuant to CPL 710.30 may not be used as evidence-in-chief, they may be used for the purpose of impeaching the testimony of a defendant during cross-examination and on rebuttal"]).
Here, the police stopped defendant outside of his place of employment, explained that he was the subject of an investigation, and asked defendant if he would accompany them back to Sheriff's Office to answer questions about the impending investigation for which he was the lone suspect. Defendant agreed and was transported to the Sheriff's Office. Once there, an investigator administered Miranda warnings and defendant engaged in a videotaped interrogation. The People have formally advised defendant, by notice, that they intend to offer statements from, and provided him a video recording of, his police interrogation.
Defendant claims in his moving papers that his incriminating statements were involuntary based on police coercion when he was forcibly taken to the Sherriff's Office on the afternoon of December 30, 2023. The present record is scant about when police stopped defendant outside of his place of employment on the day in question (cf. People v Moore, 162 AD3d at 1124).
Well-settled precedent dictates that a motion to suppress a statement as involuntary need not be supported by sworn allegations of fact; and a Huntley hearing must be conducted upon the defendant's mere claim that their statement was involuntary (see People v Knights, 124 AD2d 935, 936 [3d Dept 1986], lv denied 70 NY3d [1987]; People v Armstead, 94 AD2d 745, 745-746 [2d Dept 1983]). As stated by the Court of Appeals, "there must be a hearing whenever [the] defendant claims his statement[s] [were] involuntary no matter what facts he [or she] puts forth in support of that claim" (People v Weaver, 49 NY2d 1012, 1013 [1980]; see CPL 60.45, 710.20 [3], 710.60 [3] [b]).
Given the legal implications and significance of a potential suppression ruling concerning defendant's statements to police, the Court exercises its discretion to conduct a Huntley hearing out of prudence, and since summary denial would be inappropriate (see People v Weaver, 49 NY2d at 1013). Such would allow the Court to properly determine, among other issues, (1) when and how defendant was taken into custody; (2) whether defendant was fully informed of his Miranda rights and before any questioning commenced; (2) whether defendant knowingly and voluntarily waived his Miranda rights before his inculpatory statements and confession to Investigator Simone; and (3) whether the statements he made after he had been administered his Miranda warnings are admissible (see People v Williams, 62 NY2d 285, 289 [1984]; People v Celleri, 29 AD3d 707, 707-708 [2d Dept 2006], lvs denied 7 NY3d 786 [2006]).
A Dunaway hearing is to determine if statements attributed to defendant were the product of an impermissible arrest (see Dunaway v New York, 442 US 200 [1979]). In other words, the main purpose of a Dunaway hearing is to determine whether there was probable cause for the police to make an arrest without a warrant. The People have the burden to prove that defendant's arrest was lawful under the circumstances. Such a hearing is also warranted here.
Holding a combined Huntleyi>/Dunaway hearing would further develop the record. It would give further context as to how defendant was initially taken into custody by police and arrested. Although the record seems to indicate that defendant was cooperative in going to the Sherriff's Office for questioning and no one disputes that he was in custody in the interview room for Miranda purposes, it follows then that defendant could not be questioned until he received pre-interrogation Miranda warnings at the Sherriff's Office — a place full of law enforcement where a reasonable person would find to be an inherently coercive atmosphere (see People v Zayas-Torres, 143 AD3d 1176, 1178 [3d Dept 2016], lv denied 30 NY3d 984 [2017]; People v Daniel, 122 AD3d 401, 402-405 [1st Dept 2014], lv denied 27 NY3d 1142 [2016]). Assuming, without ruling on pertinent issues, the Court is not in a position to make significant assumptions without the benefit of an evidentiary hearing.
What Miranda and its progeny clearly establish is that the right to Miranda warnings attaches when a custodial interrogation begins. Although the circumstances of each case must certainly influence a determination of whether a suspect is in custody for purposes of receiving Miranda warnings, "the ultimate inquiry is simply whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest" (California v Beheler, 463 US 1121, 1125 [1983] [internal quotation marks and citation omitted]). "This standard is 'objective' and turns on how a hypothetical 'reasonable person in the position of the individual being questioned would gauge the breadth of his or her freedom of action'" (J.D.B. v North Carolina, 564 US 261, 286 [2011, Alito, J., dissenting], quoting Stansbury v California, 511 US 318, 325 [1994]).
The Court notes that it is not making any legal determinations but is pointing out what is reflected in the record as currently constituted. By that same token, it can be safely said that the record is not sufficiently developed for the Court to evaluate defendant's claim of involuntariness in making statements to police, the legal arguments related thereto, and to conclusively rule on whether defendant's statements should be suppressed — usually involving highly fact-based determinations.
While the Court, at this point at time, need not make any determinations relative to the issue of custody according to the dictates of Miranda and its progeny,[FN1]
the People must prove the voluntariness of defendant's statements beyond a reasonable doubt, including the burden of demonstrating that he was given his Miranda warnings when he was subjected to police interrogation — but knowingly and voluntarily waived his right to counsel (see People v Rosa, 65 NY2d 380, 386-387 [1985]).
Although defendant's motion papers do not specifically refer to any particular statements at issue, the CPL 710.30 notice indicates that the People endeavor to introduce defendant's "video statement," which, upon review, contain several inculpatory statements to police during the interrogation on December 30, 2023. Those statements could be used by the prosecution at trial against him. A Huntley hearing is thus warranted for a definitive ruling regarding admissibility of any such statements and whether they were properly obtained or made by [*11]defendant's own volition.
To the extent that defendant also seeks suppression of his statements pursuant to Dunaway, the Huntley hearing shall be inclusive of all suppression issues relative to any disputed statements (see People v Williams, 192 AD3d 1461, 1461-1462 [4th Dept 2021], lv denied 37 NY3d 961 [2021]; see generally People v Harris, 97 AD3d 1111, 1112 [4th Dept 2012], lv denied 19 NY3d 1026 [2012]). Accordingly, that branch of defendant's motion to suppress statements is granted solely to the extent that the Court shall conduct a combined Huntley/Dunaway hearing prior to trial (see CPL 710.60 [4]; see People v Mendoza, 82 NY2d at 430; cf. People v Wright, 256 AD2d 643, 645-646 [3d Dept 1998], lv denied 93 NY2d 880 [1999]).
IV. Defendant's Motion to Suppress Physical Evidence and Controvert the Search Warrants
Next, defendant moves to suppress all physical evidence seized, including suppressing the fruits of the search warrants, on the ground that such evidence was illegally searched and seized in violation of his constitutional rights. Among other relief sought, defendant also moves to controvert the search warrants and to suppress physical evidence seized in the execution thereof, claiming that the warrant was issued without probable cause. In the alternative, he requests various hearings. In urging that his claims are without merit and do not entitle him to a suppression hearing, the People maintain that defendant's conclusory claims are devoid of sworn factual allegations. The People advance that the search warrants are validly supported by probable cause, were predicated on reliable facts and circumstances, and supported by sufficient information.
A. The Search Warrants
Relevant here, two search warrants were issued by a town justice and executed of defendant's residence, motor vehicle, and his cellphone. Upon examining defendant's arguments about the search warrants, the Court highlights that he makes no pointed contentions; rather, he couches his claims as largely hypotheticals beginning with "if" and "should." In short, he makes no convincing argument.
That branch of defendant's motion to controvert the two search warrants, in contesting and disputing their issuance, is unavailing. His claim that the Aguilar-Spinelli test was not satisfied because the search warrant applications failed to establish the informant's veracity and reliability is entirely without merit (see Spinelli v United States, 393 US 410 [1969]; Aguilar v Texas, 378 US 108 [1964]). The Aguilar-Spinelli two-prong test requires that a search warrant application demonstrate the veracity or reliability of the source of the information and the basis of the informant's knowledge (see People v Griminger, 71 NY2d 635, 639 [1983]). The Aguilar-Spinelli is employed in determining the sufficiency of an affidavit submitted in support of a search warrant application (see id.).
"[A]n informant's basis of knowledge may be verified by police investigation that corroborates the defendant's actions or that develops information consistent with detailed predictions by the informant" (People v Bigelow, 66 NY2d 417, 423-424 [1985]). "[W]hen an average citizen tenders information to the police, the police should be permitted to assume that they are dealing with a credible person in the absence of special circumstances suggesting that such might not be the case" (Caldarola v Calabrese, 298 F3d 156, 165 [2d Cir 2002]).
Here, the search warrants were predicated on the complainant's accusations that defendant drugged her while she was asleep and performed sexual acts on her when she was [*12]unconscious. Her accusations were further corroborated by video recordings.
A review of the search warrants, supporting affidavits, and the sworn allegations contained therein reveal that Simone's basis of knowledge included, among other things, the information from the complainant and the video clips that were recorded from her concealed camera that was placed in a discreet location in defendant's home, relating criminal activity that Simone observed defendant engage in at the premises in question. Additionally, Simone's supporting affidavit contained reliable information based on defendant's statements during his police interview that, as a licensed anesthesiologist, he regularly transports narcotic drugs and anesthetics in a backpack to his residence, which he admitted to Simone that he is prohibited from doing. Such provided the requisite probable cause to sign a warrant authorizing a search of defendant's house.
The affidavit also details that on December 30, 2023, Investigator Kerwick of the Sheriff's Office observed defendant carrying a backpack when he was leaving work at Putnam County Hospital. The affidavit describes that Kerwick saw defendant put the backpack in the passenger side front seat of his vehicle which is registered to defendant — whereupon Kerwick asked him to come to the Sheriff's Office to discuss an ensuing investigation. The affidavit reflects, inter alia, that defendant left his vehicle locked and secured in the parking lot of the hospital with his backpack inside (possibly containing narcotic drugs). Notwithstanding, no drugs were found in defendant's car.
In addition, a separate search warrant affidavit explained in detail that defendant can be seen on the recorded video clips holding his cellphone during the early morning hours of December 30, 2023 when committing some of the alleged crimes. Simone states in an affidavit that defendant's "black touch[-]screen flip phone" was taken from his person incident to his arrest on that day, whereafter the cellphone was then appropriately marked and stored into an evidence locker in the Sheriff's Office. Collectively, the facts and permissible inferences to be drawn therefrom provided a sufficient basis to include a search of defendant's residence, vehicle, and cellphone, all of which were specifically identified in the search warrant with particularity.
The Court notes that the credibility prong is not so rigidly applied to test information offered by a complainant or disinterested eyewitness and bystanders — as distinguished from the tips of professional or confidential informants. Courts have held that police officers can reasonably rely on the "good faith observations" of private citizens (United States v McCrea, 583 F2d 1083, 1085 [9th Cir 1978]; see United States v Burke, 517 F2d 377, 380 [2d Cir 1975) [noting a "growing recognition that . . . Aguilar and Spinelli (were) addressed to the particular problem of professional informers and should not be applied in a wooden fashion to . . . information . . . from an alleged victim of . . . a crime"). A victim of a crime has sufficient reliability and credibility. Indeed, eyewitnesses, unlike professional informants, "by definition are not passing along idle rumor, for they either have been the victims of the crime or have otherwise seen some portion of it" (United States v Burbridge, 252 F3d 775, 779 [5th Cir 2001] [internal quotation marks and citation omitted]). Under well-established legal principles, the Court concludes here that the subject search warrants were supported by probable cause. The Court further finds that the foregoing allegations set forth in the two search warrant applications satisfy the two-prong test of Aguilar-Spinelli of reliability and credibility.
Next, the Court summarily denies defendant's request for an Alfinito/Franks hearing to challenge the veracity of the statements contained in the search warrant applications. "[A] defendant is entitled to [an Alfinito] hearing in which he may challenge the truthfulness of the [*13]allegations in the affidavit supporting a search warrant only where he attacks the veracity of the police officer affiant and not where . . . the credibility of the source of information is challenged" (People v Slaughter, 37 NY2d 596, 600 [1975]; see People v Alfinito, 16 NY2d 181, 186 [1965]).
Prior precedent instructs that in order to be entitled to a Franks/Alfinito hearing, the defendant must make a "substantial preliminary showing that the warrants were based upon affidavits containing false statements made knowingly or intentionally or with reckless disregard for the truth" (see Franks v Delaware, 438 US 154, 155-156 [1978]; People v Nunziata, 10 AD3d 695, 695 [2d Dept 2004], lv denied 3 NY3d 759 [2004]). A defendant may fulfill this burden by submitting "a written sworn statement alleging falsehoods in the search warrant affidavit sufficient to raise any doubt as to the probable cause supporting the issuance of the warrant" (People v Woolnough, 180 AD2d 837, 839 [2d Dept 1992], lv denied 79 NY2d 1056 [1992]). Stated differently, the defendant must show that the affiant knew or should have known of the falsity.
Contrary to his belief, defendant failed to make a "substantial preliminary showing" that the search warrants were based upon Simone's affidavits containing false statements that were made knowingly or intentionally, or with reckless disregard for the truth (Franks v Delaware, 438 US at 155-156). A review of the warrant applications disclose no false or contradictory statement. Review of the affidavits submitted in support of the warrants negate his claim. The complainant's accusations were corroborated by recorded videos evincing potentially criminal acts that were personally viewed by Simone. Second, defendant himself made several inculpatory statements during his police interview which were outlined in detail within the affidavits. Defendant casts no such doubt on Simone's statements, particularly with regard to the principal basis for the search warrants. Viewing his moving papers, defendant does not create a factual dispute to warrant a hearing into whether there was any unlawful police conduct or that police lacked probable cause.
Hence, defendant is not entitled to an Alfinito/Franks hearing since he does not challenge the veracity of the police officer, as the affiant of the search warrants (see People v Leggio, 84 AD3d 1116, 1117 [2d Dept 2011]). Defendant's motion papers merely set forth conclusory arguments and do not allege that the police officer affiant knowingly or intentionally proffered an untrue statement. Defendant thus failed to make the necessary substantial preliminary showing that the search warrants were based upon affidavits containing false statements that were made knowingly or intentionally, or with reckless disregard for the truth (see id.; People v McGeachy, 74 AD3d 989, 990 [2d Dept 2010], lv denied 15 NY3d 853 [2010]).
As for that branch of his motion to controvert the search warrants, defendant argues that the information supplied to the issuing judge in support thereof failed to establish the reliability and basis of knowledge of the informant and, therefore, failed to provide probable cause for the search warrants. Contrary to his contention however, the Court concludes that the search warrants were supported by probable cause (see People v Gordon, 36 NY3d 420, 425 [2021]). It is black-letter law that "a search warrant must be supported by evidence establishing probable cause to believe that an offense has been or is being committed, or that evidence of criminality may be found in a certain place" (People v Gaviria, 183 AD2d 913, 914 [2d Dept 1992], lv denied 81 NY2d 839 [1993] [internal quotation marks and citations omitted]; see People v Augustus, 163 AD3d 981, 982 [2d Dept 2018]). "Moreover, a search warrant may be validly based upon hearsay information found to be reliable" (People v Gaviria, 183 AD2d at 914 [*14][internal quotation mark and citations omitted]). "The legal conclusion is to be made after considering all of the facts and circumstances together. Viewed singly, these may not be persuasive, yet when viewed together the puzzle may fit and probable cause found" (People v Bigelow, 66 NY2d at 423). "There is a strong judicial preference for search warrants" (People v Rivera, 210 AD3d 805, 806 [2d Dept 2022], lv denied 40 NY3d 930 [2023] [internal quotation marks and citations omitted]). "The search warrant application must provide the court with sufficient information to support a reasonable belief that evidence of illegal activity will be present at the specific time and place of the search" (People v Corr, 28 AD3d 574, 575 [2d Dept 2006], lv denied 7 NY3d 787 [2006]). Even "some relatively minor alleged discrepancies in the supporting affidavit[]" is not enough to controvert a search warrant (People v Watson, 163 AD3d 855, 858 [2d Dept 2018], lv denied 32 NY3d 1009 [2018]).
Here, the Court holds that the complainant supplied the requisite probable cause for the search warrants. She was identified with her name, date of birth, and business relationship with defendant. Identification of the complainant is facially apparent in the applications — containing therein sufficient factual allegations of criminal conduct to justify their issuance. The complainant, as an identified citizen who was the victim of a potential crime, was presumptively reliable. Because the complainant accused defendant of a crime, the police had the necessary probable cause for the issuance of the challenged warrants (cf. People v Sahadeo, 140 AD3d at 1093; People v Mendoza, 49 AD3d at 560). "Further, the [complainant's] basis of knowledge was sufficiently established by her familiarity with the defendant, his home, and his family, and the detailed description of the criminal activity which took place . . . at the defendant's home" (People v Corr, 28 AD3d at 575).
Thus, that branch of defendant's motion to controvert the search warrants for lack of probable cause is denied. A hearing in that regard is not necessary (see People v Belizaire, 222 AD3d 875, 876 [2d Dept 2023]; People v Kelly, 151 AD3d 751, 752 [2d Dept 2017], lvs denied 30 NY3d 981 [2017], 39 NY3d 963 [2022]; People v Corr, 28 AD3d at 575).
B. No Hearing Needed on Defendant's Suppression Motion
The Court additionally finds that defendant has not provided any facts whatsoever to warrant granting a Mapp hearing. "Hearings are not automatic or generally available for the asking by boilerplate allegations" (People v Mendoza, 82 NY2d at 422).
Defendant's motion papers do not contain any sworn allegations of fact and are reliant on speculation and conjecture. Defense counsel's allegations, when considered in the context of the information provided by the People, fail to raise a factual dispute requiring a hearing. The information provided to defendant, which include the grand jury minutes, demonstrated why the police sought to question defendant based on the statements and video recordings provided by the complainant. The Court finds that police going to defendant's workplace to request for him to come to the Sherriff's Office on the arrest date was based upon probable cause in light of the complainant's serious accusations.
Furthermore, defendant's claim of innocent conduct at the time he was arrested is insufficient to warrant entitlement to a hearing. Defendant's blanket denial that he was not engaged in any criminal conduct at the time he was stopped and seized by police does not raise a factual issue. It was defendant's prior conduct in drugging the complainant and sexually abusing her that provided police the probable cause to arrest him. Under these circumstances, it was incumbent upon defendant to refute the allegations with plausible facts in order to obtain a hearing. Hence, defense counsel's averments are insufficient to entitle defendant to a Mapp [*15]hearing to determine the admissibility of the physical evidence that was seized (see People v Mendoza, 82 NY2d at 422; People v Durfey, 170 AD3d 1331, 1336 [3d Dept 2019], lv denied 34 NY3d 980 [2019]; People v Richardson, 28 AD3d 1002, 1005 [3d Dept 2006], lv denied 7 NY3d 817 [2006]).
C. The Victim is not a Confidential Informant
Lastly, no Darden hearing is required here (see People v Darden, 34 NY2d 177 [1974]). "The purpose of the Darden hearing is to verify the truthfulness of the police witness's testimony about his or her dealing with a known [confidential] informant by ensuring that the informant exists and that he or she provided the police with information about the specified criminal activity" (see People v Jackson, 189 AD3d 1705, 1705-1706 [3d Dept 2020], lv denied 36 NY3d 1098 [2021]). "[A] Darden hearing is to protect defendants from informants who may have been wholly imaginary and from communications that are entirely fictitious" (People v Kimes, 37 AD3d 1, 15 [1st Dept 2006], lv denied 8 NY3d 881 [2007]). In this case, the complainant, an alleged victim, is not a confidential informant. She testified before the grand jury (see id. at 15-16). Defendant also does not challenge the existence of a purported confidential informant (see People v Serrano, 93 NY2d 73, 77 [1999]; People v Brown, 2 AD3d 1423, 1424 [4th Dept 2003], lv denied 1 NY3d 625 [2004).
V. Defendant's Motion for a Sandoval Hearing & Molineux Material
Next, defendant moves for a Sandoval hearing as to claimed or alleged vicious, criminal, or immoral acts, conduct, offenses, or convictions attributable to him insofar that such could be used to impeach his credibility if he elects to testify at trial (see People v Sandoval, 34 NY2d 371, 375 [1974]). He also requests a Molineux hearing as to any prior conviction or uncharged crime(s) which could adversely be used against him (see People v Molineux, 168 NY 264, 293 [1901]; People v Ventimiglia, 52 NY2d 350, 359-360 [1981]). This branch of defendant's motion is granted without opposition from the People. The Court shall conduct a joint Sandoval/Molineux/Ventimiglia hearing before the commencement of trial in order to balance the probative value and prejudicial nature of any such proof (see People v Sandoval, 34 NY2d at 375; People v Lee, 129 AD3d 1295, 1297-1298 [3d Dept 2015], lv denied 27 NY3d 1001 [2016]).
In the event the People wish to make a Molineux/Ventimiglia application regarding defendant's prior bad acts, it must be filed no later than 30 days before the trial date (cf. CPL 245.10 [b]; 245.20 [3]). Within thirty (30) days from the date of this decision and order, the People shall notify and provide to defendant, in compliance with CPL article 245, a copy of defendant's summary case history in the Division of Criminal Justice Services (DCJS), and any other documents showing additional criminal convictions, if such has yet to be turned over. Additionally, the People shall notify defense counsel of all specific instances of defendant's alleged prior uncharged criminal, vicious, or immoral conduct of which the People have knowledge and intend to use at trial for purposes of impeaching defendant's credibility. Such notification shall be made in full compliance with CPL article 245.
VI. Discovery Requirements
The discovery requirements set forth in CPL article 245 must be complied with. Generally, where the evidence is not in the exclusive control of the prosecution and may be readily accessible to the defendant, then the People do not have a duty to produce it to the defendant (see generally Giles v Maryland, 386 US 66, 80 [1967]). The People have a continuing obligation to disclose and provide defendant with any material evidence already in [*16]their possession which is favorable to him, and if withheld, would deprive defendant of a fair trial — as is constitutionally mandated by Brady v Maryland (373 US 83 [1963]), its progeny, and CPL article 245. Crucially, even a delay of providing discovery does not mean that defendant will never have access to the subject disclosure in preparing for trial, insomuch as he is still entitled to receive Rosario, Brady, and Giglio material and, if need be, have a meaningful opportunity to use any exculpatory evidence (see People v Griggs, 180 AD3d 853, 855 [2d Dept 2020]; People v Hines, 132 AD3d 1385, 1386 [4th Dept 2015], lv denied 26 NY3d 1109 [2016]).
To whatever extent material that is discoverable pursuant to CPL article 245 has not already been provided by the People, such discovery, including both Brady and Rosario material, shall be provided to defendant forthwith (see Brady v Maryland, 373 US at 88; People v Rosario, 9 NY2d 286, 289-291 [1961]). To the extent defendant requests impeachment information to attack the credibility of the prosecution's witnesses, the People are likewise obligated to promptly provide Brady and Rosario material to defendant. Here, the record shows that the People filed their certificate of compliance on May 29, 2024.[FN2]
Defendant must also meet his disclosure obligations under CPL 245.20 (4) and 245.50 (1-a). The People are entitled to any reciprocal discovery. Defendant is not exempt from providing the requisite disclosure to the prosecution. Like the People, defendant, too, has a continuing duty to disclose and file certificates of compliance as may be necessary (see CPL 245.60).
If a party has a particularized reason to believe that there remains any outstanding discovery which they have yet to receive, counsel for defendant shall promptly contact the prosecutor handling this case. If there are unresolved discovery issues, defense counsel shall contact the Court to request a conference to address outstanding issues. Should a party have sufficient reason to believe, in good faith, that they have not received particular discovery to which they are entitled, they are so advised that they can later move for an order for applicable relief under CPL 245.80 (see generally CPL 245.35 ["Court ordered procedures to facilitate compliance"]).
As for the presentation of expert witnesses and disclosures related to expert opinion evidence, counsel are reminded, and defendant is so advised, that expert disclosure is automatic and must be made in compliance with CPL 245.20.
VII. Defendant's Motion Seeking Leave to File Additional Motions
Lastly, defendant seeks leave to file additional future motions should newly discovered facts or information come to light based on the ongoing investigation. The People do not oppose this request and leave it to judicial discretion.
The Court grants, in part, this branch of defendant's motion for leave to file additional motions as may be absolutely necessary. Discovery that may be forthcoming from the People may potentially lead to further motion practice.
CPL 255.20 (3) specifically sets forth the circumstances under which motions may be renewed or filed notwithstanding provisions of time or inclusion in the initial omnibus motion. Indeed, this Court could exercise its discretion to "entertain and dispose of the motion on the merits . . . in the interest of justice[ ] and for good cause" (CPL 255.20 [3]; see People v Hughes, [*17]22 NY3d 44, 49 [2013]; People v Davydov, 144 AD3d 1170, 1172 [2d Dept 2016]; People v Huang, 248 AD2d 73, 76 [1st Dept 1998]).
Notwithstanding, while defendant wishes to reserve his right to file another motion in the future, he is cautioned that such a prospective motion must not be based upon grounds which he could have easily raised in his initial motion papers — which could result in summary denial. Further, any such motion shall be promptly filed by defendant as soon as practicable without undue delay.
VIII. The Trial
Given the ensuing investigation consisting of DNA forensic testing and analysis, and additional forthcoming discovery from the People that is critical to this case, the Court will hold off on scheduling a trial date at this time. The trial shall commence with jury selection on a date to be selected by the Court. It will continue day to day until completed.
Counsel must be adequately prepared for the trial prior to its commencement. The Clerk of the Court shall notify counsel of the date that the trial shall commence. Pursuant to the provisions of 22 NYCRR 125.1 (g), the trial date will not be adjourned (see People v Colasanto, 70 Misc 3d 133[A], *1 [App Term, 2d Dept, 9th & 10th Jud Dists 2020]). Counsel and defendant are further advised that this case may be subject to advancement if the Court's trial calendar permits.
To the extent not specifically mentioned herein, the parties' remaining contentions have been evaluated. Any other relief requested that is not squarely addressed herein is either rendered academic or denied based on this decision. Accordingly, it is hereby:
Ordered that the omnibus motion of defendant PAUL GIACOPELLI (Mot. Seq. No. 2), is granted in part and denied in part, as is more fully set forth herein; and it is further
Ordered that the Court shall schedule and conduct a combined Huntleyi>/Dunaway hearing in this case prior to trial; and it is further
Ordered that if the People wish to make a Molineuxi>/Ventimiglia application, the People shall file a combined application in this regard no later than thirty (30) days before the trial date; and the Court shall conduct a combined Sandovali>/Molineux/Ventimiglia hearing prior to the commencement of trial; and it is further
Ordered that the defendant and the attorneys are directed to personally appear on July 31, 2024, at 2:00 p.m., for a status conference and further proceedings.
The foregoing constitutes the opinion, decision, and order of this Court.
Dated: July 9, 2024
Carmel, New York
E N T E R:
Hon. Anthony R. Molé
Judge of the County Court

Footnotes

Footnote 1:The issues of whether defendant knowingly, intelligently, and voluntarily waived his right to counsel and privilege against self-incrimination prior to making confession, and whether his confession was the product of coercion extracted from a police-dominated atmosphere during the questioning, need not be decided at this juncture.

Footnote 2:The People are reminded of their continuing obligation with the discovery mandates set forth in CPL article 245; and, if necessary, to file supplemental certificates of compliance as may be needed.